UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| NEW YORK STATE RESTAURANT ASSOCIATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| - against - | : No. 2007 Civ. 5710 (RJH) |
| | : |
| NEW YORK CITY BOARD OF HEALTH, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, and Thomas R. Frieden, In His Official Capacity as Commissioner of the New York State Department of Health and Mental Hygiene, | : |
| | : |
| Defendants. | : |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION

ARNOLD & PORTER LLP

399 Park Avenue
New York, NY 10022
Phone: 212-715-1000
Fax: 212-715-1399

*Counsel for Plaintiff,*
*New York State Restaurant Association*

June 14, 2007

**TABLE OF CONTENTS**

**Page**

Preliminary Statement.................................................................................................... 1

FACTUAL BACKGROUND............................................................................................ 3

A.  NYSRA Members' Communication of Nutrition Information to Consumers in
    Accordance with Public Health Consensus and Federal Law ...............................3

B.  Promulgation of New York City Health Code § 81.50 ....................................... 5

C.  Detrimental Effects of Regulation 81.50........................................................... 7

ARGUMENT.................................................................................................................. 8

I.  NYSRA IS ENTITLED TO A JUDICIAL DECLARATION THAT FEDERAL
    LABELING LAW PREEMPTS REGULATION 81.50 ...................................... 8

    A.  Caloric Labeling of Food Is Subject to the Nutrition Labeling and
        Education Act.............................................................................................9

    B.  The NLEA Expressly Preempts Non-Identical State or Local Law .................... 12

    C.  The NLEA Impliedly Preempts Regulation 81.50................................................ 16

II.  THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION TO
     PROTECT THE FIRST AMENDMENT RIGHTS OF NYSRA'S MEMBERS............. 19

    A.  NYSRA Is Likely To Succeed On The Merits Of Its First Amendment
        Claim...................................................................................................... 19

        1.  Regulation 81.50 Impermissibly Compels Speech .................................... 19

        2.  Regulation 81.50 Impermissibly Burdens Protected Speech, Even
            When Evaluated Under Intermediate Scrutiny .........................................24

CONCLUSION.............................................................................................................. 30

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Able v. United States*, 44 F.3d 128 (2d Cir. 1995) ............................................................. 19

*Bad Frog Brewery, Inc. v. New York State Liquor Authority*,
    134 F.3d 87 (2d Cir. 1998) ........................................................................... 27, 29

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005) ............................................................................... 13, 14, 16

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
    447 U.S. 557 (1980) ....................................................................................... 2, 25

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ..................................................................................... 26, 27

*English v. General Electric Co.*,
    496 U.S. 72 (1990) ........................................................................................... 8, 9

*FMC Corp. v. Holliday*,
    498 U.S. 52 (1990) ............................................................................................. 12

*Fidelity Federal Sav. & Loan Association v. de la Cuesta*,
    458 U.S. 141 (1982) ......................................................................................... 9, 18

*Geier v. American Honda Motor Co.*,
    529 U.S. 861 (2000) ................................................................................... 9, 16, 18

*Goya de Puerto Rico, Inc. v. Santiago*,
    59 F. Supp. 2d 274 (D.P.R. 1999) ................................................................. 14, 15

*Greater New Orleans Broad. Association v. United States*,
    527 U.S. 173 (1999) ............................................................................................ 26

*Green Party of New York State v. New York State Board of Elections*,
    389 F.3d 411 (2d Cir. 2004) ............................................................................... 19

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
    515 U.S. 557 (1995) ..................................................................................... 20, 21

*In re WTC Disaster Site*,
    414 F.3d 352 (2d Cir. 2005) ......................................................................... 12, 16

**Page(s)**

*International Dairy Foods Association v. Amestoy,*
 92 F.3d 67 (2d Cir. 1996)..................................................................19, 21, 25, 28, 29

*International Paper Co. v. Ouellette,*
 479 U.S. 481 (1987)....................................................................................................16

*Johanns v. Livestock Marketing Association,*
 544 U.S. 550 (2005).....................................................................................................22

*Long Island R.R. Co. v. International Association of Machinists,*
 874 F.2d 901 (2d Cir. 1989).........................................................................................19

*Lorillard Tobacco Co. v. Reilly,*
 533 U.S. 525 (2001).....................................................................................................29

*National Electric Manufacturers Association v. Sorrell,*
 272 F.3d 104 (2d Cir. 2001).........................................................................................23

*Nike, Inc. v. Kasky,*
 539 U.S. 654 (2003).....................................................................................................24

*Pacific Gas & Electric Co. v. Public Utilities Commission of California,*
 475 U.S. 1 (1986)....................................................................................................19, 20

*Perez v. Campbell,*
 402 U.S. 637 (1971).....................................................................................................16

*Public Citizen, Inc. v. Shalala,*
 932 F. Supp. 13 (D.D.C. 1996)....................................................................................11

*Reyes v. McDonald's Corp.,*
 2006 WL 3253579 (N.D. Ill. Nov. 8, 2006) ..........................................................13, 14

*Riley v. National Federation of the Blind,*
 487 U.S. 781 (1988)................................................................................................21, 24

*Rubin v. Coors Brewing Co.,*
 514 U.S. 476 (1995)..........................................................................................26, 28, 29

*Sprietsma v. Mercury Marine,*
 537 U.S. 51 (2002)........................................................................................................9

*United States v. United Foods, Inc.,*
 533 U.S. 405 (2001)...........................................................................2, 21, 22, 23, 24

**Page(s)**

*Vermont Pure Holdings, Ltd. v. Nestle Waters North America,*|
2006 WL 839486 (D. Mass. March 28, 2006)......................................................13, 14

*West Virginia Board of Education v. Barnette,*
319 U.S. 624 (1943).............................................................................................20

*Wooley v. Maynard,*
430 U.S. 705 (1977)..............................................................................19, 20, 23

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,*
471 U.S. 626 (1985)...........................................................................20, 21, 23

## STATUTES

7 U.S.C. § 136(v)(b) ...........................................................................................14

21 U.S.C. § 343......................................................................................................9

21 U.S.C. § 343-a....................................................................................................9

21 U.S.C. § 343(q)...................................................................................................9

21 U.S.C. § 343(q)(5)(A)(i)......................................................................................9

21 U.S.C. § 343(r)................................................................................................9, 12

21 U.S.C. § 343(r)(1)..............................................................................................13

21 U.S.C. § 343(r)(2)(A)(i)...................................................................................9, 10

21 U.S.C. § 343(r)(5)(B)..........................................................................................10

21 U.S.C. § 343-1(a)(4) ..........................................................................................12

21 U.S.C. § 343-1(a)(5) ..........................................................................................12

21 U.S.C. § 343-1(b)...............................................................................................13

21 C.F.R. Part 100...................................................................................................9

21 C.F.R. § 100.1....................................................................................................13

21 C.F.R. § 100.1(c)(4)............................................................................................13

**Page(s)**

21 C.F.R. § 101.9 ....................................................................................................11

21 C.F.R. § 101.9(j)(2)(i) ........................................................................................10

21 C.F.R. § 101.10 ..............................................................10, 11, 13, 15, 16, 18

21 C.F.R. § 101.13(b)(2) ..................................................................9, 10, 13

21 C.F.R. § 101.45 ...................................................................................................11

61 Fed. Reg. 40320-01 (Aug. 2, 1996) ......................................................11, 17

58 Fed. Reg. 2302-01 (Jan. 6, 1993) ..........................................................16, 17

H.R. Rep. No. 109-379 (Feb. 28, 2006) .............................................................14

24 RCNY Health Code § 81.50 (Dec. 6, 2006) ........................................ passim

S.B. 120, 2007 Reg. Sess. (Cal. 2007) ................................................................17

H.B. 54, 25th Leg. (Haw. 2007) ..........................................................................17

H.B. 389, 95th Gen. Assem. (Ill. 2007) .............................................................17

S.B. 1290, 185th Sess. (Mass. 2007) ..................................................................17

S. 2264, 213d Leg. (N.J. 2006) ...........................................................................17

City of Philadelphia, Bill No. 070153 (March 1, 2007) ....................................17

**Page(s)**

**OTHER AUTHORITIES**

Scot Burton, Ph.D., *et al.*, *Attacking the Obesity Epidemic The Potential Health
    Benefits of Providing Nutrition Information in Restaurants,*
    96 Am. J. of Pub. Health 1669 (2006) ................................................................26, 27

Department of Health and Mental Hygiene, Board of Health, "Notice of
    Adoptions on an Amendment (81.50) to Article 81 of the New York City
    Health Code (Dec. 6, 2006) ................................................................................25, 28

Food and Drug Administration, US DHHS, Public Health Service, Food
    Labeling: Questions and Answers, Volume II, "A Guide for Restaurants and
    Other Retail Establishments" (August 1995).......................................................10, 15

*Keystone Forum on Away-From-Home Foods: Opportunities for Preventing
    Weight Gain and Obesity*, Final Report, May, 2006, at 13, *available at*
    http://www.keystone.org/spp/documents/Forum_Report_FINAL_5-30-06.pdf
    (last visited June 13, 2007) ..........................................................................................4

New York City Department of Health and Mental Hygiene, Summary and
    Response to Public Hearing and Comments Received Regarding Amendment
    of Article 81 of the New York City Health Code Adding a New
    Section 81.50 to Require Labeling on Menus and Menu Boards (Nov. 27,
    2006) ...............................................................................................................10, 27, 28

"Questions and Answers: The Food and Drug Administration's Obesity Working
    Group Report," (Mar. 12, 2004) ...............................................................................17

Ray Rivera, *Survey Swaps MetroCards for Meal Receipts*
    N.Y. Times, March 30, 2007, at B2...........................................................................28

United States Department of Agriculture Dietary Guidelines for Americans
    (2005)...........................................................................................................................4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

|  |  |  |
|---|---|---|
| NEW YORK STATE RESTAURANT ASSOCIATION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| - against - | : | No. 2007 Civ. _____ |
| | : | |
| NEW YORK CITY BOARD OF HEALTH, | : | |
| NEW YORK CITY DEPARTMENT OF HEALTH | : | |
| AND MENTAL HYGIENE, and Thomas R. Frieden, | : | |
| In His Official Capacity as Commissioner | : | |
| of the New York State Department of Health | : | |
| and Mental Hygiene, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION

### Preliminary Statement

The New York State Restaurant Association ("NYSRA") seeks an order enjoining the enforcement of a newly promulgated regulation, New York City Health Code Section 81.50 ("Regulation 81.50"), which dictates how a small percentage of New York City restaurants must communicate nutrition information to the public. The Regulation applies only to the small group of restaurants in New York City that have voluntarily decided to communicate nutrition information to their customers and the public. For these restaurants—and only these restaurants—the Regulation requires that one part of the nutrition information (caloric count) be isolated and displayed in a precisely prescribed manner on menus and menu boards.

Enforcement of Regulation 81.50 should be enjoined for two complementary but independent reasons. *First*, Regulation 81.50 is preempted by federal law. By its terms, the

Nutrition Labeling and Education Act (NLEA) subjects restaurants to regulations promulgated by the Food and Drug Administration (FDA) concerning "nutrition claims." Under those regulations, restaurants are not required to convey nutrition information to their customers. However, if they voluntarily choose to do so, they must comply with the regulatory regime promulgated by the FDA under the NLEA. Further, that federal statute expressly preempts state laws like Regulation 81.50, in which a State or local entity "directly or indirectly" establishes any requirement respecting nutrition claims that is "not identical" to the regulatory requirements of federal law. Because Regulation 81.50 imposes food labeling requirements different from (*i.e.* not "identical to"), the federal regulations, it is expressly preempted by the NLEA and void under the Supremacy Clause.

*Second*, Regulation 81.50 violates the First Amendment rights of plaintiff's members. The City's regulation forces these restaurants to change the content of the speech they convey on menu boards. The Regulation also forces the restaurants to undercut the message about nutrition that they already convey elsewhere. The City mandates that the restaurants convey *the City's* message—incomplete and out-of-context though it may be—in the precise manner and in the precise spot that the City thinks best. This is compelled speech. The Regulation violates the principle set forth by the Supreme Court in *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001), that even in the context of commercial speech, the government simply may not compel a speaker to convey a message the speaker does not want to convey.

In addition, Regulation 81.50 cannot survive even the more forgiving intermediate scrutiny set forth in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 566 (1980). Under the doctrine of *Central Hudson*, the burden falls on the City (a) to identify a legitimate government interest, (b) show that the Regulation is effective in

serving that interest, and (c) show that the Regulation is narrowly tailored to further the interest. The Board of Health contends that the Regulation will further the interest of public health by reducing the incidence of obesity in the general population. But Regulation 81.50 applies only to a small percentage of restaurants in New York City. It has caused some restaurants to stop providing nutrition information so as to avoid its onerous requirements. Other restaurants that might have begun to provide nutrition information have been discouraged. The City can make no case that the Regulation will have a plausible effect on obesity levels in the City. It passed the Regulation after only the most cursory investigation. In fact, it appears from recent statements made by the Department of Health that the Regulation is part of a social science experiment to determine *whether* requirements such as these have any effect, and if so, how much. Whatever value such experiments might have, plaintiff's members should not be *forced* to be the subjects, at the expense of their First Amendment freedoms.

Regulation 81.50 is unconstitutional. NYSRA seeks preliminary injunctive relief pursuant to Rule 65 forbidding defendants from enforcing Regulation 81.50, which violates the First Amendment freedoms of NYSRA's members. In addition, NYSRA seeks an expedited declaratory judgment under Rule 57 declaring Regulation 81.50 preempted by federal law.

## FACTUAL BACKGROUND

### A.    NYSRA Members' Communication of Nutrition Information to Consumers in Accordance with Public Health Consensus and Federal Law

If there is a magic bullet to combat obesity in America, no one has found it. Recent governmental publications suggest that there is no one cause of obesity, that a web of factors acting together over time contribute to obesity, and that further study is needed, particularly in understanding how consumers use nutritional information. For example, the United States

Department of Agriculture focuses on four recommendations for combating obesity: (a) physical activity; (b) maintaining a balanced diet with proportionality, variety and moderation; (c) nutrient-dense foods containing calcium, potassium, fiber, magnesium and Vitamins A, C and E; and (d) limited intake of sodium and alcoholic beverages. *See* USDA's "Dietary Guidelines for Americans" (2005) (attached to the Appendix to this Memorandum ("Appendix") at Tab A); Demuth Decl. ¶¶ 16, 18.

Recently, the Food and Drug Administration asked The Keystone Center for Science and Public Policy to design, convene, and facilitate a forum seeking collaborative solutions in the area of away-from-home foods. The Keystone Forum's final report (May 2006), concluded that there is no public health consensus on how consumers use nutrition information:

> There is a clear need for more research regarding how the provision of nutrition information, claims (such as "low calorie"), and symbols influence consumer preference and choice for away-from-home food consumption situations. Of particular concern is how, when, and why consumers use nutrition information and claims during their decision-making processes. More specifically, a better understanding is needed of the types of factors that moderate consumers' responses to the provision of nutrition information and claims for away-from-home foods.[1]

The chapter concludes with a list of suggested research questions for addressing these topics.

The legislative and regulatory environment (described below) confirms that the federal government has made a determination that the effective communication by restaurants of nutrition information to customers is a complex and uncertain subject; that there is no one "right way" to communicate this information; that restaurants should be permitted and encouraged to

---

[1]   The Keystone Center, *The Keystone Forum on Away-From-Home Foods: Opportunities for Preventing Weight Gain and Obesity*, Final Report, May, 2006, at 13, *available at* http://www.keystone.org/spp/documents/Forum_Report_FINAL_5-30-06.pdf (last visited June 13, 2007).

4

try different ways of communicating; and that they should not be burdened by specific requirements that would hinder experimentation. Congress has given the FDA plenary authority over the nutrition content claims voluntarily made by restaurants (*e.g.*, "contains 100 calories"). The FDA, in turn, has given restaurants flexibility in determining whether and how to communicate such claims. The NLEA prohibits states from imposing any different or additional requirements. (*See infra* at 11-16).

Against this backdrop, some restaurants in New York City voluntarily publish comprehensive nutrition information about the food items they sell. They publish this information in order to assist their customers to make healthful and appropriate food choices. Realizing that consumers have individual dietary needs and restrictions, these restaurants— consistent with the views of the public health community—believe that the best way to serve their customers is to provide them with a complete nutritional breakdown of their menu items— one that includes factors such as fat, saturated fat, dietary fiber, sugar, cholesterol, protein, carbohydrate, sodium, and vitamin and mineral content, as well as recommended percentages of daily consumption values and calories. Such restaurants provide comprehensive nutritional information through websites, brochures, on-package labeling, posters, and tray liners. Customers have the opportunity to compare and contrast the nutritional content of various food items which, these restaurants believe, leads to more informed choices based on each consumer's individual needs.

**B.    Promulgation of New York City Health Code § 81.50**

After just one day of hearings—most of which focused on a regulation not at issue here— the New York City Department of Health and Mental Hygiene ("Department of Health") determined that it had found the "right way" for restaurants to communicate with their customers

and decided to impose that way on a small fraction of the restaurants in New York City.   On

December 5, 2006, the Department of Health adopted Regulation 81.50 (copy attached at

Appendix Tab D), which compels a small group of restaurants in New York City that have

voluntarily decided to communicate nutrition information to their customers and the public to

isolate and display one part of that nutrition information (caloric count) in a precisely prescribed

manner on menus and menu boards.  The Regulation, which becomes effective on July 1, 2007,

applies only to those restaurants that voluntarily provided calorie information to the public as of

March 1, 2007.  In addition, the Regulation applies only to those menu items that are

standardized with regard to portion size, formulation, and ingredients.  According to the

Department of Health, only ten percent of New York City restaurants meet these criteria and will

be subject to the Regulation's requirements.

The Regulation prescribes the precise manner in which calorie counts must be displayed.

Under the Regulation, menu boards and menus must list the calorie content value next to each

menu item.  *See* 24 RCNY Health Code § 81.50(b).  "The term 'calories' or 'cal' shall appear as

a heading above a column listing the calorie content value of each menu item, or adjacent to the

calorie content value for each menu item, in the same or larger typeface as the calorie content

values for individual menu items."  *Id.* § 81.50(b)(1).  The Regulation mandates the size and

typeface that the restaurant must use to present the caloric value of an item.  In the case of menu

boards, "calorie content values [must] be posted in a size and typeface at least as large as the

name of the menu item or price, whichever is larger."  *Id.* § 81.50(b)(1)(A).  In the case of

printed menus, the Regulation requires that "calorie content values . . . be legible and . . . printed

in a size and typeface at least as large as the name or price of the menu item."  *Id.*

§ 81.50(b)(1)(B).

**C.     Detrimental Effects of Regulation 81.50**

NYSRA believes that Regulation 81.50 will undermine its members' nutrition objectives and interfere with their ability to communicate effectively with their customers.  Displaying calories in isolation will inaccurately overemphasize the importance of calories to a well-balanced diet, and neglect the relevance of other important nutrients and other contributing causes of obesity.  Forcing restaurants to highlight calories in isolation from other nutrients increases the risk that consumers will ignore other nutritional information that restaurants would like to provide to them.  In addition, studies have shown that most consumers do not know the significance of a particular calorie count.  *See, e.g.,* Haugen Decl. ¶ 5 and the International Food Information Council Foundation Food and Health Surveys for 2006 and 2007 (copies attached at Appendix Tabs B and C, respectively); Demuth Decl. ¶ 17.  So, for them, it is of limited use to provide the caloric values of particular food items alone, without also informing them what the daily recommended calorie levels of a healthy diet are.

Menu boards are the most valued space in the restaurants that offer standardized food items and thus are subject to the Regulation.  *See* Munoz Decl. ¶ 3; Colón Decl. ¶¶ 3-5.  Available space on the menu boards is already very limited.  Adding calorie information will result in menu boards that are cluttered and that in all likelihood will need to use very small font sizes.  This will make menu boards confusing and difficult for consumers to read, directly interfering with the ability of such restaurants to communicate with their customers.  *See* Liewen Decl. ¶ 10; Richardson Decl. ¶ 6; Munoz Decl. ¶¶ 5 & 6.

Regulation 81.50 has established a rigid and irrational regime.  Although the Regulation provides that the Department of Health can accept alternatives to posting on menu boards, the Department has nonetheless rejected reasonable alternatives such as counter mats at the point of

purchase or signs on stanchions. *See* Colón Decl. ¶¶ 8 &9; Horn Decl. ¶ 4. The City has determined that Regulation 81.50 applies only to menu boards, and not to menu listings on cards in glass cases. *See* Horn Decl. ¶ 4. It has determined that a restaurant can comply by listing a 'range' of calories for menu items that vary, even if that range is so great as to make the disclosure meaningless (*e.g.*, "contains 40 to 400 calories"). *See* Liewen Decl. ¶¶ 9, 11 &12; Burnett Decl. ¶ 6.

Regulation 81.50 has chilled the speech of some NYSRA members by imposing burdensome conditions on speech. Some NYSHA members previously published nutrition information on their websites and in stores, but as of March 1, 2007 abandoned disclosure of nutrient information rather than attempt compliance with the Regulation. *See* Burnett Decl. ¶ 4; Richardson Decl. ¶ 4.

## ARGUMENT

NYSRA seeks a declaratory judgment declaring Regulation 81.50 to be preempted by federal statute and regulation and therefore in violation of the Supremacy Clause of the United States Constitution. NYSRA also seeks a preliminary injunction precluding defendants from violating the First Amendment rights of its members by enforcing the Regulation.

## I.   NYSRA IS ENTITLED TO A JUDICIAL DECLARATION THAT FEDERAL LABELING LAW PREEMPTS REGULATION 81.50

Under the Supremacy Clause, Congress may preempt any state law that conflicts with the exercise of federal power. "Pre-emption fundamentally is a question of congressional intent . . . and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *See English v. General Elec. Co.*, 496 U.S., 72, 78-79 (1990) (citation

omitted).  Federal regulations "have no less a pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

To determine whether Regulation 81.50 is preempted, the Court follows a well-established two-step analysis, deciding (i) whether NYSRA members' presentation of calories and other food nutrients are governed by federal law; and (ii) if so, whether that federal law expressly or impliedly preempts Regulation 81.50.  *See, e.g., Sprietsma v. Mercury Marine*, 537 U.S. 51, 56 (2002); *Geier v. American Honda Motor Co.*, 529 U.S. 861, 867 (2000).  Because the answer to both questions is yes, Regulation 81.50 must be declared void.

### A.   Caloric Labeling of Food Is Subject to the Nutrition Labeling and Education Act

Congress enacted the Nutrition Labeling and Education Act (NLEA) in 1990.  *See* 21 U.S.C. §§ 343, 343-a (copy attached at Appendix Tab E).  The NLEA governs two related areas: subsection (q) imposes mandatory food labeling requirements for packaged foods.  Packaged foods must, for example, bear a label that identifies serving size, number of servings per package, and certain nutrition information in a detailed format mandated by the FDA. Subsection (r) gives the FDA regulatory authority over more general nutrient and health benefit "claims" associated with food, such as "contains 100 calories."  21 U.S.C. §§ 343(q), (r); 21 C.F.R. § 101.13(b)(2).  Pursuant to the grant of authority in subsection (r), the FDA has enacted extensive rules regarding labels and claims associated with food.  *See* 21 C.F.R. Part 100.

Restaurants are partially exempt from this regime.  Restaurants are wholly exempt from the food labeling requirements of subsection (q).  21 U.S.C. § 343(q)(5)(A)(i).  But subsection (r), concerning nutrient claims, contains only a limited exemption for restaurants.  Under subsection (r), any nutrient content claim—if it is voluntarily made by the restaurant—*must* be

9

made in accordance with regulations promulgated by the FDA. 21 U.S.C. § 343(r)(2)(A)(i). Restaurants are exempt only to the extent that they make claims relating to (1) cholesterol, (2) saturated fat, (3) dietary fiber, or (4) nutrients that increase the risk of disease. 21 U.S.C. § 343(r)(5)(B). Under the applicable regulations, restaurants choose whether to opt into the general nutrition claim and labeling scheme promulgated under subsection (r). *See* 21 C.F.R. § 101.9(j)(2)(i) (regulations apply unless the food served "bears no nutrition claims or other nutrition information in any context on the label or in the labeling or advertising").

Restaurants that voluntarily disclose nutrient information about menu items (including the caloric value of food) through food labeling, such as billboards, brochures in restaurants, and restaurant internet websites, are subject to the NLEA's food labeling regime. Because statements about calories are "nutrient content claims" within the meaning of the NLEA, they are governed by regulations promulgated by the FDA under authority of subsection (r). *See* 21 C.F.R. § 101.13(b)(2) (stating that a nutrient claim is "any direct statement about the level or range of a nutrient in food," such as "contains 100 calories").

For restaurants subject to the NLEA, the FDA has promulgated a special rule. 21 C.F.R. §101.10 (1996) (copy attached to Appendix at Tab F).[2] Unlike other kinds of food labeling, the

---

[2]    The FDA promulgated this regulation in 1996. During the notice and comment period for Regulation 81.50, the Department of Health relied on an outdated statement by the FDA (issued in 1995) to dismiss concerns about preemption. According to the Department, this 1995 statement supported its position that nutrition claims on restaurant menus were exempted from the requirements of the NLEA. *See* New York City Department of Health and Mental Hygiene, Summary and Response to Public Hearing and Comments Received Regarding Amendment of Article 81 of the New York City Health Code Adding a New Section 81.50 to Require Labeling on Menus and Menu Boards, at 11 (Nov. 27, 2006) (copy attached to Appendix at Tab G) (citing statement in a 1995 FDA publication that "claims on menus are not currently subject to NLEA.") (Food and Drug Administration, US DHHS, Public Health Service, Food Labeling: Questions and Answers, Volume II, "A Guide for Restaurants and Other Retail Establishments" (hereinafter "FDA Q&A Vol. II") (copy attached to Appendix at Tab H), Question/Answer Number 31 at 10 (August 1995)).

*Footnote continued on next page*

FDA gives restaurants broad freedom to present accurate information concerning nutrient claims in any reasonable manner.  The FDA's nutrition claim and labeling requirements for restaurants provide, in part:

> Nutrition labeling in accordance with § 101.9 [specifying nutrition facts required on labels] shall be provided upon request for any restaurant food or meal for which a nutrient content claim . . . is made, except that information on the nutrient amounts that are the basis for the claim (*e.g.*, "low fat, this meal provides less than 10 grams of fat") may serve as the functional equivalent of complete nutrition information as described in § 101.9.  Nutrient levels may be determined by nutrient data bases, cookbooks, or analyses or by other reasonable bases that provide assurance that the food or meal meets the nutrient requirements for the claim.  ***Presentation of nutrition labeling may be in various forms, including those provided in § 101.45 [concerning certain unprocessed foods] and other reasonable means.***

21 C.F.R. § 101.10 (emphasis added).  Thus, the FDA has given restaurants great flexibility to decide how to communicate nutrient information to customers.  For example, a restaurant may communicate nutrition information through in-store signs, posters, brochures, notebooks or charts, as contemplated in 21 C.F.R. § 101.45.  Restaurants also may communicate nutrition claims through various "Nutritional Facts" formats set out in 21 C.F.R. § 101.9.  But these options are not exclusive.  Section 101.10 allows restaurants to provide information through "other reasonable means" as well.

---

*Footnote continued from previous page*

It is true that, as of 1995, the FDA considered restaurant menus to be completely exempt from the NLEA.  But soon after the FDA published its 1995 statement, the blanket exemption under the NLEA for restaurant menus was held to violate the NLEA.  *See Public Citizen, Inc. v. Shalala,* 932 F. Supp. 13, 18 (D.D.C. 1996).  Consistent with that decision, the FDA revised its regulations to acknowledge that nutrient claims on restaurant menus were *not* exempt, and instead fell within the coverage of the statute.  *See* 61 Fed. Reg. 40320-01 (Aug. 2, 1996) (final rulemaking revising regulations: reversing earlier rule that had completely exempted restaurant menus from the requirements for nutrient content claims and health claims).  As of 1996, the FDA acknowledges that the NLEA covers nutrient and health claims (including caloric content) on restaurant menus.

In short, there can be no doubt that restaurant disclosure of calories is governed by federal law and that the federal law grants restaurants freedom to choose among a variety of formats in displaying the information.

### B.    The NLEA Expressly Preempts Non-Identical State or Local Law

State law is expressly preempted when "Congress' command is explicitly stated in the statute's language." *FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990) (internal quotations omitted).  When an express preemption provision exists, a determination of its scope begins with "'the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" *In re WTC Disaster Site*, 414 F.3d 352, 372 (2d Cir. 2005) (citation omitted).

Here, Congress has preempted state laws that are not "identical to" the requirements of section 343(r) and FDA regulations promulgated thereunder.  The preemption statute provides, in part:

> no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce —
>
> * * * * *
>
> (5) any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or labeling of food that is ***not identical to*** the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food [by restaurants concerning cholesterol, saturated fat and dietary fiber and nutrients that increase the risk of disease,] which is exempt under section 343(r)(5)(B).

21 U.S.C. § 343-1(a)(5) (emphasis added) (copy attached at Appendix Tab I).[3]

---

[3]    Subsection (q) also has an associated express preemption provision, 21 U.S.C. § 343-1(a)(4), but it does not cover restaurants because they are exempt from the requirements of subsection

*Footnote continued on next page*

There can be no doubt that Regulation 81.50 imposes requirements "respecting any claim of the type described in section 343(r)(1)" because publishing calorie content is a nutrition claim under that section. *See* 21 U.S.C. § 343(r)(1); 21 C.F.R. § 101.13(b)(2).  And Regulation 81.50 imposes requirements not "identical" to those of the federal law and its accompanying regulations, 21 C.F.R. § 101.10.

Under the FDA's implementing regulations, the prohibition against state laws not "identical to" the federal requirements extends to any state requirement that —

> directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that:
>
>> (i) Are not imposed by or contained in the applicable provision (including any implementing regulation) of [§§ 343(q) or (r)]; or
>>
>> (ii) Differ from those specifically imposed by or contained in the applicable provision (including any implementing regulation) of [§§ 343(q) or (r)].

21 C.F.R. § 100.1(c)(4) (copy attached at Appendix Tab J).

Two federal district courts have interpreted the term "not identical to" as used in two subsections of Section 343-1(a). *See Reyes v. McDonald's Corp.*, 2006 WL 3253579, at *4 (N.D. Ill. Nov. 8, 2006) (construing section 343-1(a)(5)); and *Vermont Pure Holdings, Ltd. v. Nestle Waters North America*, 2006 WL 839486, at *5 (D. Mass. March 28, 2006) (construing section 343-1(a)(1)).  Both courts followed the preemption analysis set forth in *Bates v. Dow*

---

*Footnote continued from previous page*

(q).  In addition, section 343-1(b) contains an exception that gives States the right to petition the FDA to exempt certain non-identical state and local requirements from preemption.  21 U.S.C. § 343-1(b); *see also* 21 C.F.R. § 100.1 (implementing subsection 343-1(b)).  The Department of Health has never sought or been granted an exemption for Regulation 81.50 pursuant to this procedure.

*Agrosciences LLC*, 544 U.S. 431 (2005).  In *Bates*, the Supreme Court analyzed the preemption

provision of a federal labeling statute.  The preemption provision applicable there provided that

states "'shall not impose or continue in effect any requirements for labeling or packaging *in*

*addition to or different from* those required under this subchapter.'"  *Bates*, 544 U.S. at 436

(quoting 7 U.S.C. § 136v(b)) (emphasis added).  The Court in *Bates* concluded that the plain

language of the preemption statute meant that a state labeling law would be preempted if (i) the

state law is a requirement for "labeling or packaging;" and, if so, (ii) it imposes a requirement "*in*

*addition to or different from those required*" under federal law.  544 U.S. at 444 (internal

quotations omitted) (emphasis in original).  Conversely, state law could avoid preemption only if

it were "equivalent to and fully consistent with" federal law.  *Id.* at 447.  To determine

equivalency and consistency, the *Bates* court instructed lower courts to measure state law

requirements against standards found in the statutes as well as relevant "regulations that give

content to [the statute]."  *Id.* at 453.

The courts in *Reyes* and *Vermont Pure* applied the preemption test of *Bates,* replacing the

language of the federal act at issue in *Bates*, "in addition to or different from" with the even

stricter phrase "identical to" found in the applicable statute here, Section 343-1(a)(5).  *See Reyes*,

2006 WL 3253579, at *5-6; *Vermont Pure*, 2006 WL 839486, at *5.  These courts applied the

plain language—"identical to"—so that state law was preempted unless it had "substantially the

same language as the comparable provision" of federal law.  *Vermont Pure,* 2006 WL 839486, at

*5 (quoting H.R. Rep. No. 109-379 (Feb. 28, 2006)).  In *Goya de Puerto Rico, Inc. v. Santiago*,

59 F. Supp. 2d 274, 279 (D.P.R. 1999) (decided six years before *Bates*), the court considered

whether the Puerto Rico Department of Agriculture requirement for the labeling of pigeon peas

was preempted by subsection 343-1(a)(2), a provision analogous to the one at issue here.  The

14

Puerto Rican regulation required that the name and address of both the canner and importer be

printed on the label, whereas the subsection 343(e) gives businesses discretion to choose whether

to include on the label the name and place of business of the importer, packer, or distributor. *Id.*

at 280. The court in *Goya de Puerto Rico* found the Puerto Rican law preempted, reasoning that

the federal law "was quite clear about the kind of information that state labeling laws could

require." *Id.* Precisely the same reasoning applies to this case.

Section 101.10 of Title 21 of the Code of Federal Regulations, which is the FDA

regulation implementing the relevant provisions of the NLEA, allows restaurants to decide which

"reasonable means" is best suited to convey nutrient claims to customers. Indeed, the FDA

specifically stated that Section 101.10 does not require food labeling to be in a particular format:

> **Question:**
> FDA's requirement for the Nutrition Facts format are fairly
> specific with respect to type style, type size, and placement. Does
> the agency have similar requirements for nutrition labeling of
> restaurant foods?
>
> **Answer:**
> It depends on the format used. Nutrition labeling for restaurant
> foods may be presented in various formats, including Nutrition
> Facts (§ 101.9), following the format established for raw fruit,
> vegetables, and fish (§ 101.45), and by other reasonable means
> (*e.g.*, a statement such as "low fat, this food contains no more than
> 3 grams of fat" in a brochure or notebook) (§ 101.10).
>
> ***Consistent with its flexible approach towards restaurant food
> labeling, FDA has not established standardized type size or
> placement requirements in § 101.10.*** Labeling that is easily
> accessible to consumers, that contains all required nutrition
> information, and that is presented clearly and legibly, would be
> generally consistent with the "reasonable means" provision of
> § 101.10.

FDA Q&A Vol. II, Question/Answer Number 80, at 24 (emphasis added) (Appendix Tab H).

*See also infra* at 16-17.

Regulation 81.50 imposes mandatory nutrient disclosure requirements where the federal regulation does not.  Regulation 81.50 restricts the flexibility that the FDA provided to restaurants.  It requires that certain nutrition information (calories) be isolated from other nutrition information and presented in a particular format (on the restaurant menus and menu boards), in a particular font size (equal to the larger of the menu item or price).  These content and presentation requirements are not "identical" to those of the NLEA or of the FDA's regulations promulgated thereunder, Section 101.10.

### C.    The NLEA Impliedly Preempts Regulation 81.50

Even when Congress has not expressly displaced state laws, state law is impliedly preempted "to the extent that it actually conflicts with federal law." *In re WTC Disaster Site*, 414 F.3d at 372.  Such "conflict" preemption occurs where the "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citation omitted).  Such preemption occurs when the state law stands as an obstacle to the full implementation of the federal regulatory plan, even if state law shares the same goals as the competing federal law. *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987); *accord Perez v. Campbell*, 402 U.S. 637, 650-52 (1971).  Implied preemption may arise from federal regulations implementing federal statutes, *see Bates*, 544 U.S. at 452, and even when the statute at issue also contains an express preemption clause that does not apply, *see Geier*, 529 U.S. at 872-74.  Here, because Regulation 81.50 directly interferes with the flexibility chosen by the FDA to encourage restaurants to provide nutrient information, it is impliedly preempted.

Through the flexibility provided in Section 101.10, the FDA encourages restaurants to give consumers accurate and complete nutrition information and to encourage product innovation through the development and marketing of improved foods. *See* 58 Fed. Reg. 2302-

01 (Jan. 6, 1993); 61 Fed. Reg. at 40323.  At the same time, the FDA has recognized that

imposing onerous labeling requirements on restaurants would discourage them from voluntarily

providing nutrition information.  *See* 58 Fed. Reg. at 2388 (recognizing that "flexibility . . . will

help assure that restaurants, especially small restaurants, will not be deterred by the 1990

amendments from providing useful nutrition-related information to their customers.").  Indeed,

the FDA determined that because of "the difficulty of providing nutrition labeling for restaurant

foods . . . a requirement for full nutrition labeling could be a significant barrier to the transfer of

information about favorable nutritional characteristics of restaurant foods." *Id.* at 2389.

Consistent with this policy, the FDA does not require restaurants to isolate any one nutrient value

from other nutrient information, or to provide nutrient information "on the menu or menu board."

*See* "Questions and Answers: The Food and Drug Administration's Obesity Working Group

Report," at 9 (Mar. 12, 2004) ("Q:  Are restaurants required to provide nutrition information on

their menu items?  A: . . .  The restaurant may provide information about the nutrient for which

the claim is made in various ways, including in brochures.  In other words, restaurants need not

provide such information on the menu or menu board.") (copy attached at Appendix Tab K).[4]

Rather, the federal policy is, expressly, one of flexibility.[5]

---

[4]    Dr. Mark B. McClellan, Commissioner of Food and Drugs, established the Obesity Working
Group in 2003 to prepare a report that outlines an action plan to address the obesity problem
from FDA's perspective and authorities.  The FDA Center for Food Safety and Applied Nutrition
publishes periodic Questions and Answers addressing issues raised in the report.

[5]    Without a ruling that inconsistent state and municipal laws, such as the New York City
regulation, are preempted, restaurants could ultimately be subject to hundreds of different
regulatory regimes, which is exactly what Congress and the FDA did not want to happen.  Many
states and localities already have pending legislation that would impose new requirements on
restaurants and that differ from the NLEA.  *See, e.g.,* S.B. 120, 2007 Reg. Sess. (Cal. 2007); H.B.
54, 24th Leg. (Haw. 2007); H.B. 389, 95th Gen. Assem. (Ill. 2007); S.B. 1290, 185th Sess.
(Mass. 2007); S. 2264, 213rd Leg. (N.J. 2006); City of Philadelphia, Bill No. 070153 (March 1,
2007).

The Supreme Court has repeatedly held that, when federal law implements federal policies by explicitly affording regulated entities a choice of options, states may not limit them. *See, e.g., Geier*, 529 U.S. at 875, 881. In *Geier*, the Supreme Court held that federal regulations implementing federal car safety standards for passive restraint devices preempted negligence claims based on state product liability laws. *See Geier*, 529 U.S. at 881. The Court reasoned that because the federal car safety standards "deliberately provided the manufacturer with a range of choices among different passive restraint devices" in order to foster experimentation and innovation in the development of passive restraint devices, the plaintiff's tort claim, in seeking to limit that range of choice to driver's side airbags, was impliedly preempted. *Id.* at 875, 881.

Here, the requisite direct interference with the federal regulatory program exists. As noted above, the FDA afforded restaurants a range of presentation options under Section 101.10 to further the NLEA's objectives of allowing restaurants to determine how best to present nutrition information. *See de la Cuesta*, 458 U.S. at 154-56 (finding that state common law rule which limited the use of "due on sale" clause in mortgage contract cases whereas federal regulation specifically allowed a savings and loan the flexibility to enforce such a clause "at its option" created "an obstacle" to the federal regulation and was therefore preempted) (internal quotations omitted). Courts give significant weight to explicit statements of the federal agencies favoring a choice of options. *See, e.g., Geier*, 529 U.S. at 883 (stating that the federal agency's views of its own regulations "should make a difference").

II.   **THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION TO PROTECT THE FIRST AMENDMENT RIGHTS OF NYSRA'S MEMBERS**

Under Rule 65, a plaintiff can obtain a preliminary injunction against infringement of constitutional rights by the State. *See Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004). A preliminary injunction is proper where a plaintiff shows (a) irreparable harm, and (b) a likelihood of success on the merits. *Id.*; *Long Island R.R. Co. v. International Ass'n of Machinists*, 874 F.2d 901, 910 (2d Cir. 1989); *see International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996) ("because the injunction at issue stays 'government action taken in the public interest pursuant to a statutory . . . scheme,' this Court has determined that the movant must satisfy the more rigorous 'likelihood of success prong'") (quoting *Able v. United States*, 44 F.3d 128, 131-32 (2d Cir. 1995)).

When a preliminary injunction is sought to prevent infringement of First Amendment rights, irreparable harm is presumed. *See Green Party of New York State*, 389 F.3d at 418; *International Dairy Foods Ass'n*, 92 F.3d at 71 ("It is established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'") (citation omitted).

A.   **NYSRA Is Likely To Succeed On The Merits Of Its First Amendment Claim**

1.   **Regulation 81.50 Impermissibly Compels Speech**

The First Amendment guarantees "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U. S. 705, 714 (1977). It applies to compelled speech as it does to restraints on speech. *See id.* This is because the right to refrain from speaking "serves the same ultimate end as freedom of speech in its affirmative aspect." *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*, 475 U.S. 1, 11 (1986) (internal

quotations omitted).  Compelled speech, like bans on speech, violate "the fundamental rule of

protection under the First Amendment," namely "that a speaker has the autonomy to choose the

content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of

Boston*, 515 U.S. 557, 573 (1995).  State regulations compelling speech must be carefully

scrutinized because "unjustified or unduly burdensome disclosure requirements might offend the

First Amendment by chilling protected commercial speech." *Zauderer v. Office of Disciplinary

Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

Thus, the Supreme Court has repeatedly struck down laws that compel a speaker to utter

a message dictated by the government.  The Court first invalidated an outright compulsion of

speech in *West Virginia Board of Education v. Barnette*, 319 U. S. 624 (1943).  The State

required every schoolchild to recite the Pledge of Allegiance while saluting the American flag.

The Court held that the First Amendment does not "le[ave] it open to public authorities to

compel [a person] to utter" speech with which he does not agree.  *Id.* at 634.  *In Wooley v.

Maynard*, 430 U. S. 705 (1977), the Court struck down a statute requiring automobile license

plates to bear the State's motto, "Live Free or Die."  The Court explained that requiring citizens

to "use their private property as a 'mobile billboard' for the State's ideological message" violated

the First Amendment by compelling speech.  *Id.* at 715.  In *Pacific Gas & Electric Co.,* the Court

invalidated a state order requiring a utility company to include in its billing envelopes messages

prepared by a consumer organization.  The Court reasoned that, because corporations, like

individuals, have "the choice of what not to say," the order violated the First Amendment by

forcing the company "to associate with speech with which [it] may disagree." *Pacific Gas &

Electric Co.*, 475 U.S. at 15-16.  And in *Hurley*, the Court reversed a Massachusetts ruling

requiring the (private) organizers of Boston's St. Patrick's Day Parade to include a group of

marchers who wished to convey a message which the promoters opposed, explaining that the state may not "compel affirmance of a belief with which the speaker disagrees." *Hurley*, 515 U.S. at 573-74 (citation omitted).

The right not to speak "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573-74 (citations omitted). In *Riley v. National Federation of the Blind*, 487 U.S. 781 (1988), the Court found that a state law requiring fundraisers to disclose the percentage of funds that were actually paid to charity before seeking contributions from prospective donors violated the First Amendment. The Court refused to distinguish *Riley* from other compelled speech cases such as *Pacific Gas*, *Barnette*, or *Wooley*, "simply because [these latter cases] involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech." *See Riley*, 487 U.S. at 797-98.

This protection against compelled speech also extends to commercial speech. *See United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *Zauderer*, 471 U.S. at 651 ("[U]njustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech."); *International Dairy Foods Ass'n*, 92 F.3d at 71 ("The right not to speak inheres in political and commercial speech alike.") (citations omitted).

Regulation 81.50 impermissibly compels speech. In requiring the posting of the calorie counts of food items on menu boards next to the price, the Regulation forces restaurants to use their most important tool for communicating with their customers to voice a point of view with which they disagree, namely that calories are the only nutritional criterion that patrons need toconsider when making food selections. These restaurants, which have voluntarily provided comprehensive nutritional information to the public, have spent time and resources in

understanding what nutritional information can best serve their consumers. By forcing restaurants to post calories in isolation, restaurants are required to speak in a way that communicates the City's point of view regarding the significance of calories and undermines their own point of view. This approach is doubly offensive here, because menus and menu boards are among the most important ways that restaurants communicate with their customers. To permit the government to commandeer that valuable mode of communication and dictate the message that restaurants convey—a message they do not wish to convey—raises free speech concerns.

In *United Foods*, the Supreme Court held that a monetary assessment imposed on mushroom growers pursuant to a federal act to fund advertisements of mushrooms violated the First Amendment because it compelled the growers to subsidize commercial speech with which they disagreed. *United Foods*, 533 U.S. at 411-16. The government used the assessments to pay for generic advertising to promote the sale of mushrooms. *Id.* at 408. The plaintiff objected because it did not want to support a generic advertising campaign that promoted all mushrooms, but rather wanted to convey a message that its mushrooms were superior to mushrooms grown by other producers. *Id.* at 411. Notably, the Court drew a distinction between the (unconstitutional) statute before it, which "simply" required the mushroom growers to "support speech by others" by paying money, and even more onerous statutes, which force a party to "utter the speech itself." *See id.* at 413; *see also Johanns v. Livestock Marketing Ass'n,* 544 U.S. 550, 568 (2005) (Thomas, J. concurring) ("The government may not, consistent with the First Amendment, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them. . . .").

The Regulation here is far more offensive than the one at issue in *United Foods*, for it requires a restaurant to use its own forum to convey the Department of Health's message as if it were the restaurant's message. Similarly, Regulation 81.50 compares unfavorably to the state law struck down in *Wooley*. There, the plaintiff disagreed with the content conveyed on a state-issued license plate. Here, the City demands that the content be conveyed not on a government-issued license plate, but on the restaurant's own signage.

Of course, the government retains the power to compel disclosure needed to prevent misleading commercial speech. But the Regulation cannot be sustained on that basis, because it has nothing to do with protecting consumers from being misled.[6] This Regulation is not actually

---

[6]   The Supreme Court's decision in *Zauderer* highlights the distinction between permissible and impermissible disclosure requirements. In *Zauderer*, the Court addressed a state rule concerning lawyers who advertised their contingency fee rates, requiring contingency fee advertisements to disclose whether clients would have to pay costs on top of the contingency fee. The Court upheld this disclosure requirement based on its finding that omission of this information could mislead consumers. *See Zauderer*, 471 U.S. at 648; *see also United Foods*, 533 U.S. at 416 (finding *Zauderer* inapplicable because there was no suggestion "that the mandatory assessments [at issue in *United Foods*] . . . [were] somehow necessary to make voluntary advertisements nonmisleading for consumers."). Here, the compelled disclosure of calorie information is not needed to make menu boards non-misleading. Consumers are well aware that food has calories and would never think that the absence of calorie information indicates that the food does not have calories, or even that the food is low in calories. Indeed, the Department of Health does not claim that preventing consumers from being deceived or misled is the motivation behind the Regulation.

This case is also distinguishable from the Second Circuit's opinion in *National Electric Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). In *Sorrell*, the court applied *Zauderer's* rational basis test to a state labeling law that required the disclosure of mercury content on certain commercial products. The court found that *Zauderer's* rational basis test was the proper test to apply because the statute at issue compelled only "'purely factual and uncontroversial'" disclosure of otherwise unknown safety information. *Id.* at 113-14 (quoting *Zauderer*, 471 U.S. at 651). *Sorrell's* analysis is irrelevant here because (a) the fact that food contains calories is already well known and the amount of calories in any given food item is disclosed elsewhere, and (b) the compelled speech at issue is not "purely factual and uncontroversial," but rather forces restaurants to use their most valuable communication tool to convey a viewpoint with which they disagree. In addition, *Sorrell* includes *dicta* that might be deemed overly expansive in the light of the Supreme Court's 2001 decision in *United Foods*, which clarified that *Zauderer* does not apply when restrictions on speech are not intended to prevent consumers from being misled. *United Foods*, 533 U.S. at 416. *United Foods* was decided only a few weeks before *Sorrell* but *Sorrell* did not address the new Supreme Court case.

a "disclosure" requirement. It does not require restaurants to disclose information about calories or anything else. It applies only to restaurants that already provide calorie information. It thus makes the voluntary disclosure of information more onerous than it would otherwise be. The Regulation thus chills disclosure. In fact, some restaurants have found the burdens imposed by the regulation to be so onerous as to cause them to withdraw nutrition information rather than comply with the Regulation. *See Riley*, 487 U.S. at 794 (regulation "necessarily chill[ed] speech" in violation of First Amendment by subjecting speakers to threat of litigation, thus "'reduc[ing] the quantity of expression'") (citation omitted).

Members of NYSRA that wish to provide caloric information want to do so in context. They do not wish to isolate caloric information and highlight it to the exclusion of other nutrition information. In contrast, the City demands the right to commandeer the menu and to force the owner of the menu to convey information that the owner does not want to convey on the menu. Some restaurants have already withdrawn their disclosures rather than comply with the Regulation. The First Amendment prohibits this state action.

### 2.   Regulation 81.50 Impermissibly Burdens Protected Speech, Even When Evaluated Under Intermediate Scrutiny

In *United Foods*, discussed *supra*, the Court found that because compelled speech is such a serious government intrusion, it did not need to apply the four-part test set out in *Central Hudson*. As noted above, this is an *a fortiori* case from *United Foods* because it involves compelled speech itself, rather than the subsidy at issue there.[7]

---

[7]   In *United Foods*, the Court went further and suggested that it might be time to rethink *Central Hudson*. The Court noted that many of its members had criticized *Central Hudson* in other cases; but whether to overturn *Central Hudson* was a question left to a later case. The Court later granted *certiorari* to consider that very question, but procedural issues persuaded a majority of the Court not to reach the merits of that case. *See Nike, Inc. v. Kasky*, 539 U.S. 654, 665 (2003) (Stevens, J., concurring in dismissal of *certiorari*).

Nevertheless, even if this Court were to apply the test of *Central Hudson*, Regulation 81.50 should be held unconstitutional.  In *Central Hudson*, the Supreme Court articulated a four-part analysis for determining whether a government restriction on commercial speech violates the First Amendment.  Under this test, a court must determine:  (1) whether the expression concerns lawful activity and is not misleading; (2) whether the asserted governmental interest is substantial; (3) whether the Regulation directly advances the asserted interest and (4) whether it is not more extensive than is necessary to serve that interest. *Central Hudson*, 447 U.S. 557, 566 (1980).

1.      The City makes no contention that the speech at issue is misleading or concerns unlawful activity.  The speech plainly falls within the protection of the First Amendment.

2.      The state has a substantial interest in public health.  The Department of Health promulgated the Regulation to "decrease [individuals'] risk for the negative health effects of overweight [sic] and obesity associated with excessive calorie intake."  Notice of Adoption of An Amendment  (81.50) to Article 81 of the New York City Health Code (Dec. 5, 2006) ("Notice of Adoption") at 1 (copy attached at Appendix Tab L).  NYSRA agrees that the government's interest in protecting human health by reducing obesity is substantial.  This is the interest that the Department of Health proffered in the Notice of Adoption.  And it is the interest that the Regulation must be shown to further.[8]

---

[8]    The Department of Health may seek to justify the Regulation simply as a means to better inform a certain group of restaurant-goers (*i.e.*, those that eat at the estimated ten percent of the restaurants covered by the Regulation) about calories.  But such a goal—divorced from the goal of reducing obesity—is not a legitimate basis on which to sustain the compelled speech at issue here.  As the Second Circuit has already ruled, "consumer curiosity alone is not a strong enough state interest to sustain compulsion of even an accurate, factual statement . . . in a commercial context."  *See International Dairy Foods Ass'n*, 92 F.3d at 74 (citation omitted).

3.      The City cannot demonstrate that the Regulation "advances [the City's] interests in a direct and material way." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *Central Hudson*, 447 U.S. at 564. The burden of justifying a restriction on commercial speech rests with the proponent of the restriction. *See Edenfield*, 507 U.S. at 770. "[M]ere speculation or conjecture" will not suffice to sustain this burden. *Id.* Rather, the Department "must demonstrate that the harms it recites are real and its restriction will in fact alleviate them to a material degree." *Id.* at 771. Otherwise, "'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (quoting *Edenfield*, 507 U.S. at 771); *accord Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 189 (1999).

The studies upon which the Department of Health relied in promulgating the Regulation do not conclude that posting calorie information in isolation on menu boards will have the effect of decreasing caloric intake and the incidence of obesity. The Department of Health cites to three studies, all of which are authored by the same two lead authors. *See* Notice of Adoption at 2 nn. 14-18. The Court need not consider whatever defects these studies might have because the authors themselves do not claim for their studies the propositions for which the Board of Health proffered them. In the most recent of the cited papers, the authors specifically limit their claims to the "*potential*" health benefits. The authors never put forth a correlation between posting nutritional information and observable health effects, let alone an impact on obesity rates. The authors state that "[p]rovision of nutrition information on restaurant menus *could potentially* have a positive impact on public health by reducing the consumption of less-healthful foods." Scot Burton, Ph.D., *et al.*, *Attacking the Obesity Epidemic: The Potential Health Benefits of Providing Nutrition Information in Restaurants*, 96 Am. J. of Pub. Health 1669 (2006) (emphasis

added).  The authors do no more than suggest that "new restaurant-oriented nutrition information

initiatives *may be warranted.*"  *Id.* at 1674 (emphasis added).  Additionally, the article does not

advocate providing calorie information in isolation.  In fact, the authors opine that calories

displayed with other nutrient information (*i.e.*, fat, saturated/trans fats and sodium levels) could

have a greater impact on purchase intentions than calories alone.  *See id.*[9]

Moreover, the Department of Health cannot demonstrate a causal link between the

requirements of Regulation 81.50 and the reduction of obesity "'*to a material degree.*'"  *Bad*

*Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir. 1998) (quoting

*Edenfield*, 507 U.S. at 771) (emphasis in original).  Only ten per cent of the City's restaurants

will be required to post calorie information on their menus and menu boards.  The Department of

Health offers no information as to how many City residents take all (or even a substantial

portion) of their meals in chain restaurants, how those customers might be affected by calorie

information on menu boards, or what the Department of Health did to confirm the effectiveness

of its regulation.  In addition, the Regulation exempts many of the foods offered by restaurants

by requiring that calorie count information be provided only for foods listed on the menu board.

Finally, the Department of Health has not accounted for the fact that the Regulation actually

causes some restaurants to cease providing nutrition information.  The Department of Health

simply denied that this would happen.[10]

---

[9]  The study found that purchase intentions for a chef salad did not substantially change when
subjects were given only calorie information, but that purchase intentions for a chef salad were
substantially lower when subjects were given calories plus nutrient information.  The authors
concluded that this was due to the fact that the salad, while containing a moderate amount of
calories, "substantially exceeds the levels of fat and saturated fat expected by consumers."
*Attacking the Obesity Epidemic*, 96 Am. J. of Pub. Health at 1673-74.

[10]  *See* New York City Department of Health and Mental Hygiene, Summary and Response to
Public Hearing and Comments Received Regarding Amendment of Article 81 of the New York
City Health Code Adding a New Section 81.50 to Require Labeling on Menus and Menu Boards,
*Footnote continued on next page*

In fact, the Department of Health acknowledged that it had no idea whether Section 81.50 would have *any* affect on health, let alone a material one. In response to one of the public comments that it received, questioning whether the Regulation would achieve its stated goal, the Department of Heath acknowledged that "[t]he health impact of calorie labeling *will be evaluated*" and that it is just one of the policy efforts that the city is pursuing. *See* Summary and Response to Public Hearing and Comments Received Regarding Amendment of Article 81 of the New York City Health Code Adding a New Section 81.50 to Require Calorie Labeling on Menus and Menu Boards, at 4 (Nov. 27, 2006) (emphasis added) (Appendix Tab G). A Department representative made similar comments to *The New York Times*. *See* Ray Rivera, *Survey Swaps MetroCards for Meal Receipts*, N.Y. Times, March 30, 2007, at B2 ("Because we are breaking new ground with this initiative, it is crucial that we evaluate our efforts so we can assess their impact and help combat obesity in New York City and the nation.") (copy attached at Appendix Tab M). Without any evidence that the Regulation will have a positive impact on the health of its citizens, the Regulation cannot withstand First Amendment scrutiny. *See Rubin*, 514 U.S. at 490 (striking down federal law prohibiting the disclosure of alcohol content on beer labels because the government failed to provide any "convincing evidence" that the Regulation would in fact further the government's asserted interest). The Department of Health cannot fall back on its assertion that the Regulation is justified by the fact that consumers would like to have access to this information, as it asserts in its Notice of Adoption. *See* Notice of Adoption at 3. The City

---

*Footnote continued from previous page*

at 5-6 ("It would be a striking development if establishments which had already made nutrition information publicly available withdrew this information rather than making it available where consumers would readily see it.") (Appendix Tab G).

cannot meet its burden by merely claiming strong consumer interest or even the public's right to know. *See International Dairy Foods Ass'n,* 92 F.3d at 74.

    4.        Regulation 81.50 also fails because "the speech restriction" may not be "more extensive than necessary to serve the interests that support it." *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 556 (2001) (internal quotations omitted). The law demands "a means narrowly tailored to achieve the desired objective." *Id.* (internal quotations omitted); *Bad Frog Brewery, Inc.,* 134 F.3d at 100-01 ("*Central Hudson's* fourth criterion . . . requires consideration of whether the prohibition is more extensive than necessary to serve the asserted state interest.") (citations omitted). A restriction on speech is "more extensive than necessary" if "less intrusive" alternatives are available. *Rubin,* 514 U.S. at 491; *Bad Frog Brewery,*134 F.3d at 101.

    Here, the City has spurned the many alternatives to the Regulation's requirement to post calorie information on menus and menus boards. Even accepting, *arguendo,* the City's premise that providing calorie information at the point of purchase is useful in combating obesity, less burdensome alternatives are available. These include providing comprehensive nutritional information (including calories) on (i) countermats, (ii) tray liners; (iii) brochures placed by cash registers; or (iv) on separate billboards, posters, or stanchions. Additionally, in order to ensure that consumers know that nutritional information is readily available, menu boards could contain a message directing consumers to other sources of information. These alternatives would give consumers similar access to calorie information in a manner less likely to be offensive to restaurants. In fact, several restaurants proposed such alternatives to the Department, but the Department rejected them.

## **CONCLUSION**

For all the reasons stated above, the Court should grant plaintiff's motion for declaratory

relief on its preemption claim and for preliminary injunctive relief on its First Amendment claim.

Dated:  June 14, 2007
        New York, New York

ARNOLD & PORTER LLP

By:_____

Peter L. Zimroth (PZ-1029)
Kent A. Yalowitz (KY-3234)
Nancy G. Milburn (NM-9691)
Brandon H. Cowart (BC-1615)

399 Park Avenue
New York, NY 10022
Phone: 212-715-1000
Fax: 212-715-1399

*Counsel for Plaintiff,*
*New York State Restaurant Association*