UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK STATE RESTAURANT
ASSOCIATION,

        **Plaintiff,**

     - against -

NEW YORK CITY BOARD OF HEALTH,
NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE, and
Thomas R. Frieden,
In His Official Capacity as Commissioner
of the New York City Department of Health
and Mental Hygiene,

        **Defendants.**

---

:
:
:
:
:
:
: **No. 2007 Civ. 5710 (RJH)**
:
:
:
:
: **DECLARATION OF DAVID B.**
**ALLISON, Ph.D**
:
:
:
:
:
:

---

David B. Allison, Ph.D declares under penalty of perjury as follows:

## A. Background and Qualifications

I am a Professor in the Departments of Biostatistics, Nutrition Sciences, Medicine, and Genetics, and Director of the National Institutes of Health-funded Clinical Nutrition Research Center at the University of Alabama at Birmingham. I am also a Senior Scientist at the Center for

### Table of Contents for Report

A. Background & Qualifications.

B. Materials Reviewed and Relied Upon.

C. Opinions to Be Offered and Propositions to Be Addressed.

D. Standards of Evidence.

E. Remarks on Propositions Supporting Concern about Obesity.

F. Remarks on Propositions Supporting Conjecture that Providing Calorie Information at The Point of Purchase In Restaurants (Especially Fast Food Restaurants) Might Be Beneficial in Reducing Obesity Levels.

G. Is there Competent and Reliable Evidence that (A) Providing Restaurant Patrons with Calorie Information On Menu Items in Any Manner Will Reduce Individual or Population Levels of Obesity; and (B) That Doing So in the Manner Mandated by R81.50 Will Reduce Obesity More Effectively Than Will Providing Such Information in Some Other Manner??

H. Are There Reasons to Conjecture That There Might Be Unintended Deleterious Effects of the City's Proposed Rule?

I. Summary.

Outcomes and Effectiveness Research and Education at the University of Alabama at Birmingham. In my current position, and in previous positions, I have conducted extensive research on the causes, consequences, and treatment of obesity; on the development and evaluation of statistical methods; and on study design. I have played a major role in the design, analysis, and interpretation of studies involving weight loss interventions. I received a Ph.D. in Psychology from Hofstra University in 1990 and am a licensed psychologist in the State of NY.

I am currently Vice-President of *NAASO: The Obesity Society*, the largest and most prestigious academic society for the study of obesity in North America, and will become President in October 2008. I have authored, in whole or in part, over 300 articles appearing in peer-reviewed journals. Many of these articles address nutrition, obesity, weight-loss, study design, and statistical analysis. I have also edited, authored, or co-authored multiple text books and chapters in text books on the topics of nutrition, obesity, and weight-loss. I have served on the editorial boards of the journals Obesity, Obesity Reviews, Nutrition Today, International Journal of Obesity, International Journal of Eating Disorders and Evidence-Based Preventive Medicine.

I previously served as an Associate Research Scientist at the NIH-funded New York Obesity Research Center at Saint Luke's/Roosevelt Hospital Center and as Associate Professor of Medical Psychology in Psychiatry at Columbia University in New York City. At the New York Obesity Research Center, I was primarily involved with designing and conducting original research in human obesity and related areas, collaborating with other investigators on their projects, particularly with respect to data analysis, and training students, interns, and post-doctoral fellows with respect to obesity research projects.

I have periodically served as a consultant to the Federal Trade Commission (FTC), the Food and Drug Administration (FDA), the United States Postal Inspection Service, and the United States Department of Justice on the validity of weight-loss product claims. In that capacity, I have reviewed numerous clinical research studies in order to determine whether efficacy claims are supported by the research. In 2006, I hosted, organized and spoke at a 2-day conference on *Design, Analysis and Interpretation of Randomized Clinical Trials in Obesity*. This conference was funded by the NIH through a grant on which I was the principal investigator.

I have been elected as a fellow of the American College of Nutrition and of the American Statistical Association, and am a member of the New York Academy of Sciences.

My experience, training, and research expertise qualify me to offer informed opinions on the evidential basis or lack thereof for claims that the New York City regulation requiring some restaurants that already provide their patrons with calorie information to post it in a specified manner will help reverse an epidemic of obesity among New York City residents.

My curriculum vita is attached as Exhibit A and includes a more detailed description of my training and experience, and a listing of my publications.

**B.    <u>Materials Reviewed and Relied Upon.</u>**

I have reviewed the NYC Board of Health's Notice of Adoption of Regulation 81.50 and the studies cited in that Notice in support of the contention that the regulation will impact the amount of calories New Yorkers consume and will thereby help prevent obesity. I have also reviewed the July 5, 2007 Declaration of Thomas R. Frieden, MD, MPH and many of the articles cited by Frieden in support of his supposition

that Regulation 81.50 will have an effect in reducing obesity. I have also reviewed the amicus brief filed by the City of San Francisco Attorney's Office, and many articles cited therein. I have also conducted a review of the scientific articles bearing on the topic and have reviewed those that appeared most relevant and cite key articles in the references to this document.

**C.    Opinions to be Offered and Propositions to Be Addressed**

The issues under consideration are complex and there is a multiplicity of ideas involved. Hence to avoid any misconstrual, I wish to begin by clarifying not only what I see as the fundamental issues and what I will offer opinions on, but also what I will *not* address and which opinions I am *not* offering.

**C.1. Issues on Which I Will Not Opine.**

My goal is to provide an assessment of whether there is scientific evidence showing that Regulation 81.50 (hereafter *R81.50*) will achieve the objective of reducing obesity levels among NYC residents and/or people that dine in NYC. This is an empirical question that can be addressed via a consideration of scientific evidence. In contrast, whether R81.50 is 'good,' legally defensible, fair, adverse to legitimate economic interests, or 'should' be adopted are questions of a legal and social nature and I will **not** be addressing those questions. I will attempt to provide scientific information that can be used as inputs in the social and legal decision making process. However, I am **not** offering the opinion that **(1)** R81.50 should not be adopted; nor am I offering the opinion that **(2)** R81.50 should be adopted.

**C.2. Issues on Which I will Opine.**

I believe that the propositions or issues that are germane to the scientific basis or lack thereof for adopting R81.50 can be grouped into three categories: **(1)** Those that

support concern about obesity and suggest that as a society we should be seeking ways to reduce obesity and/or the deleterious effects it causes. I address these propositions in section E of this report; **(2)** Those that support the conjecture that providing calorie information at the point of purchase in restaurants (especially fast food restaurants) might be beneficial in reducing obesity levels. I address these propositions in section F of this report; and **(3)** Those that, if true, would directly indicate that implementation of R81.50 would be beneficial in reducing obesity levels. I address these propositions in section G of this report.

**D.    <u>Standards of Evidence</u>**

Before proceeding to an evaluation of relevant evidence, it is important to clarify the standard of evidence I will refer to herein. I refer to scientific evidence and by evidence I mean facts that could potentially lead to a reasonable *conclusion* that causation exists as opposed to facts that could lead one to *conjecture* or *hypothesize* about putative causation. Clearly, this standard requires that we seek evidence generated using procedures generally accepted in the scientific community as capable of supporting valid conclusions as to causation.

When evaluating outcome claims about interventions in humans, there are clear standards accepted by the biomedical research community. These standards are articulated in a number of publications relating to testing effects of interventions in general (e.g., Meinert et al., 1986), interventions for weight control (Allison et al., 1997; Committee for Proprietary Medicinal Products, 1997; FDA, 1996; Gadbury et al., 2003; Anderson et al.,1998), and in the legal context specifically (Green et al., 2000). Although there may be nuances to studying effects with one type of intervention

(product, program, substance) as compared to another, the same general principles of sound experimental design, statistical analysis, and interpretation apply.

A key point to consider when reviewing purportedly scientific opinions is the joint concept of objectivity and observability in the scientific process. The process leading to conclusions should be an objective one that is articulable and observable and, therefore, can be checked and reproduced by other scientists as well as evaluated for validity. To illustrate this point, consider the fact that many scientific journals, including the prestigious *Proceedings of the National Academy of Sciences*, ask their peer-reviewers to answer the following question when evaluating manuscripts that have been submitted for publication "Are the procedures described sufficiently well that the work can be repeated?" Simply stating that one has reviewed evidence and come to a conclusion without describing what the *objective* criteria for reaching such a conclusion are and showing that those criteria were met does not make something a valid scientific opinion.

### Types of Information that are Generally Accepted by the Scientific Community as Sufficient Evidence that an Intervention Aimed at Preventing Obesity Is Effective.

With respect to assessing any possible effects of an intervention to reduce obesity, including both putative beneficial and deleterious effects, the ideal source of evidence would be one or more large randomized, controlled trials (RCTs) of the intervention, in a sample from the population of interest. Importantly, these RCTS must be well designed, well executed, and well analyzed. An RCT is a study in which humans are assigned to two or more conditions via a random process. Those conditions should ideally be identical in all respects except for the independent variable (i.e., 'treatment') under study. The group getting the treatment or intervention is generally

referred to as the treatment or experimental group and the group that does not get the treatment in question is called the control group. After some appropriate period, all subjects in each of the two groups are then measured on the outcome (i.e., dependent variable) and compared with respect to the outcome using an appropriate statistical test.

However, for practical or ethical reasons, it is often impossible to conduct an RCT to address a particular question. In such situations, an observational (epidemiologic) study might be the best alternative, and evidence from such studies, though imperfect, would be the key evidence sought. In an observational study one studies people who were exposed (through their own choice or other circumstances) to the intervention of interest and compares them to people who were not so exposed. Observational epidemiologic studies cannot unequivocally demonstrate causality, but can document associations[1]. Associations observed in observational epidemiologic studies are more compelling with respect to possible inference to causation when the study is well designed, conducted, and analyzed. Again, one or more studies finding supportive results are not sufficient to support a claim if they are only a subset of a larger number of studies some of which obtain contradictory evidence and the weight of evidence is not supportive.

Critically, because randomization is not used in observational epidemiologic studies, potential confounding factors must be delineated, carefully measured, and carefully controlled for in the statistical analysis. Unlike RCTs which can control for both

---

[1] In the field of statistics, two variables (e.g., a putative cause and a putative outcome) are said to be associated if and only if they are not independent. Two variables are independent if and only if the conditional distribution of one variable is identical for all levels of the other variable. Association differs from and does not necessarily imply causation. Causation means that one of the variables influences the other.

known and unknown confounding factors, observational epidemiologic studies can only control for confounders[2] to the extent that the confounding variables can be effectively measured and for which the functional form of the relation between the potential confounding variable and the outcome can be effectively modeled in the statistical analysis.

In evaluating the body of evidence bearing on whether a treatment or intervention is effective, it has become standard in 'evidence-based' medicine and public health to rank studies according to objective criteria that include consideration of whether the data comes from RCTs or observational studies, the consistency of the data, and other aspects of study design and methodology. One authoritative set of criteria is that used by the National Heart, Lung and Blood Institute in its "Clinical Guidelines on the Identification, Evaluation and Treatment of Obesity - The Evidence Report" (2000). Those criteria rate evidence from a series of well-designed RCTs that provide a consistent pattern of findings in the population for which a recommendation is made as "Category A" evidence. Where there are only a few RCTs or findings are less than consistent, the evidence is ranked "Category B". Evidence from observational studies is rated "Category C". Evidence based only on expert clinical judgment is rated

---

[2] Confounding and confounders have been defined as follows:

> **confounder or confounding factor**: A cause of something being studied ( i.e a disease) whose effect on that disease is mixed up with the effect (or non-effect) of another factor because the "confounder" is associated with that other factor. See "confounding".
>
> **confounding**: Epidemiologists use the term when the impact of two risk factors are associated with the same exposure and must be disentangled. Heavy alcohol consumption and smoking are both known to cause esophageal cancer. If people who drink also tend to smoke, then the effect of drinking will confound the effect of smoking and vice versa. Therefore one must correct for this confounding in the way the data are analyzed. Sometimes the non-effect of a factor which conveys no risk at all is confounded with the true effect of another factor. ...
>
> **See**: http://www.dhs.ca.gov/ehib/emf/RiskEvaluation/Appendix8.pdf

lowest, as "Category D". These or similar categories have been applied in assessing the evidence that public health interventions aimed at improving diet or reducing caloric consumption among the general public have been shown to be efficacious (Faith et al, 2007; see Seymour et al, 2004).

E.     **Remarks on Propositions Supporting Concern about Obesity.**

The City, Dr. Frieden, and the amicus brief (hereafter simply *amicus*) filed by the City of San Francisco Attorney's Office all offer a number of propositions, and evidence in support of those propositions that, if true, justify substantial concern about obesity and suggest that as a society we should be seeking solutions. These propositions can be summarized in the following points.

*Proposition E1.* During the last several decades, the prevalence of obesity increased substantially in the world, the nation, and in NYC and is now sufficiently high as to represent a major public health concern.

*Proposition E2.* Obesity has many deleterious effects for the individual including reduced longevity, reduced quality of life, and reduced health and may also be costly to society.

I believe that *Propositions E1 and E2* are true and have indeed published many papers providing the evidence that would support them (see CV attached). Moreover, I believe that the evidence supporting these points has been well documented by the City, Dr. Frieden, and the amicus, and therefore I will not dwell on them further. I also agree with the apparent conclusion of the City, Dr. Frieden, and the amicus that accepting *Propositions E1 and E2* justifies substantial concern about obesity and suggests that we should be seeking solutions.

**F.    Remarks on Propositions Supporting Conjecture that Providing Calorie Information at The Point of Purchase In Restaurants (Especially Fast Food Restaurants) Might Be Beneficial in Reducing Obesity Levels.**

The City, Dr. Frieden, and the amicus advance several other propositions that, if true, I believe support the conjecture that providing calorie information at the point of purchase in restaurants (especially fast food restaurants) might be beneficial in reducing obesity levels. These propositions may be stated as follows.

*Proposition F1.* Obesity largely results from extended periods of positive energy balance (i.e., periods where energy intake exceeds energy expenditure).

*Proposition F2.* On average, Americans eat more food in restaurants now (in both absolute calories and as a proportion of total caloric intake) than Americans did in the past.

*Proposition F3.* Many of the foods served in restaurants are quite energy dense[3] and quite high in absolute calories.

*Proposition F4.* On average, Americans substantially underestimate the calories of food served in restaurants, largely as a function of large portion sizes.

*Proposition F5.* Restaurants and restaurant food are contributing to the obesity epidemic in some manner that is above and beyond the contribution offered by any source of food energy.

I accept all of Propositions F1 to F3 and think that they are sufficiently well documented (including in materials presented by the City, Dr. Frieden, and the amicus) to not merit further discussion. With respect to Proposition F4, I do believe that there are reasons to question it. People may not report their true beliefs about the calorie content

---

[3] Energy density refers to the energy ('calories') in foods divided by the weight (grams) of those foods.

of foods they typically eat accurately in part because doing so may help to preserve their self-image and public personae as 'reasonable' eaters. We have previously shown evidence that would suggest this is the case (Muhlheim et al., 1998). Nevertheless, I suspect that even were this putative bias taken into account, patrons would still be shown to underestimate the caloric content of large restaurant (and also large non-restaurant) meals and food items. Thus, for the purposes of further discussion, I will accept the validity of Proposition F4.

In contrast, the support for Proposition F5 is more open to question. Clearly, acceptance of proposition F1 implies that any source of food energy consumed by humans is contributing to the obesity epidemic. This is as true for fresh fruits, vegetables and lean broiled fish as it is for French fries, ice cream, and refined sugar. But this statement is more tautological than informative. Acceptance of Proposition F1 does not *ipso facto* imply that restaurants and restaurant food are contributing to the obesity epidemic in some manner that is *above and beyond* the contribution offered by any source of food energy.

Though acceptance of Propositions F1 to F4 make it plausible that Proposition F5 is true, there are several reasons to retain some skepticism about the truth (or lack thereof) of Proposition F5. These include the following.

**(1)** There are many plausible contributors to the obesity epidemic beyond restaurant food. My colleagues and I recently reviewed 10 of them in a widely discussed paper (Keith et al., 2006). Our thoughts have been echoed by other obesity researchers publishing in respected peer-reviewed journals (e.g., Astrup et al., 2006; Bray & Champagne, 2005; Eisenmann, 2006; Heindel, 2003; Jacobson

et al., 2007; Newbold et al., 2007) and there are additional putative contributors beyond the 10 we mentioned (c.f., Pasarica & Dhurandhar, 2007).

**(2)** The evidence directly in favor of the unique role of restaurants as contributing to the obesity epidemic, is strictly from observational research, and more importantly, equivocal. The data cited in support of the unique role of restaurants rarely, if ever, stem from RCTs, and generally do not even include a consistent body of observational epidemiologic studies. I acknowledge that there are multiple epidemiologic studies showing a positive ('direct') association (not necessarily causation) between fast food and/or general restaurant consumption and overweight, obesity, of BMI (BMI denotes body mass index, a measure of relative weight [kg/m²] used as a proxy for adiposity). Some of these studies were cited by the City, Dr. Frieden, and the amicus and there are others still that support a positive or direct association that they did not cite (e.g., Schroder et al., 2007). Yet, there are also multiple studies that do not support this association (e.g., French et al 2001; Jeffery et al, 1998; Sanigorski et al., 2007). The findings of French et al. (2001) are especially interesting. In a sample of 4,746 adolescents, *"Overweight status was not significantly associated with FFFRU [frequency of fast food restaurant use] among males or females. Interestingly, BMI was significantly lower among males who reported using fast food restaurants three or more times per week, compared with those reporting less frequent fast food restaurant use. BMI was not significantly associated with FFFRU among females"* (French et al., 2001, p. 1828). That is, in this large sample, not only was BMI not positively correlated with frequency of fast food restaurant use, but it was negatively correlated in males.

**(3)** When correlations have been observed between fast food use and overweight, obesity, or BMI, such correlations are plausibly due to confounding. Fast food restaurants tend to be more prevalent in the poorest and most deprived neighborhoods (Block et al., 2004; Cummins et al., 2005; Reidpath et al., 2002) and poverty and deprivation have been associated with obesity (Phipps et al., 2006). Moreover, fast food restaurant use has been associated with having soda and chips in the home (Boutelle et al., 2007), more TV and video viewing (Taveras et al., 2006), and lower income (French et al., 2000), all factors that have been proposed or shown to be associated with obesity. Thus, these factors may be confounding the association (if any) between fast food consumption and obesity. The plausibility of confounding by these factors is increased by the findings that: **(a)** At least one study found fast food patronage/consumption to be more strongly associated with BMI or BMI gain than is other restaurant consumption (Duffey et al., 2007) and yet other restaurants have not been shown to have consistently more nutritionally sound food (Saelens et al., 2007) and may even provide higher calorie meals to many patrons (Yamamoto et al., 2006). This suggests the hypothesis that fast food patronage is correlated with BMI or BMI change more so than is other restaurant patronage because fast food patronage is a marker for lower socioeconomic status and/or other confounding factors.

Given the forgoing points, I concur with Jeffery et al. (2006) who wrote "*Available data on fast food use and obesity are far from conclusive, however. For example, the direction of causation is unclear, i.e., the menus and prices at "fast food" restaurants may result from the demands of an increasingly obese population rather*

than being a direct cause of obesity. It is also possible that a third variable, such as demographics and lifestyle characteristics (e.g. an aging population with smaller families and a higher percent of two income families), may cause both phenomena."

Despite the reasons for skepticism about the truth of Proposition F5 I have offered above, I nevertheless believe that Propositions F1 to F3 are true, I accept proposition F4, and Proposition F5 is plausible. In turn, on this basis, I believe it is reasonable to conjecture that providing calorie information at the point of purchase in restaurants (especially fast food restaurants) might be beneficial in reducing obesity levels.

However, I believe it is equally reasonable to conjecture that providing calorie information at the point of purchase in restaurants (including fast food restaurants) would have no beneficial effect on reducing obesity levels. This is because providing such calorie information may have little to no effect on reducing caloric intake in the restaurants affected by R81.50 (Yamamoto et al., 2006), patrons may compensate for any reduced caloric intake that does occur by increasing caloric intake or decreasing caloric expenditures in other settings (Foltin et al., 1992; King et al., 2007; Whybrow et al., 2007), obesity-predisposed patrons may choose to frequent other restaurants not posting caloric information where overeating may be normative as they have been shown to do elsewhere (Stunkard & Mazer, 1978), or any effect of providing calorie information may be 'washed out' or overridden by the many other factors influencing body weight (Bray & Champagne, 2005). Of course, this is all just conjecture, but it is well-reasoned conjecture based on the scientific literature. Given that one can reasonably conjecture in either direction, it is critical to turn to an assessment of the direct evidence (if any) that does or does not support the proposition that R81.50 will be effective in reducing obesity levels.

**G.    Is there Competent and Reliable Evidence that (A) Providing Restaurant Patrons with Calorie Information On Menu Items in Any Manner Will Reduce Individual or Population Levels of Obesity; and (B) That Doing So in the Manner Mandated by R81.50 Will Reduce Obesity More Effectively Than Will Providing Such Information in Some Other Manner?**

This question, which is key to assessing the evidentiary basis for Regulation 81.50, must be broken down into a number of components to properly analyze the relevant studies.

First, one must distinguish between short and long-term effects[4]. In the obesity field, it is well-established that it is far easier to influence weight for a short period of time than for a long one. We have substantial data showing that weight control interventions that successfully alter behavior over the short term – days, weeks, or even months – prove to demonstrate little to no efficacy over years (Hill et al., 2005). This may be related to 'set points' around which people maintain their weight, and the strong physiological signals that influence 'energy compensation' (Keesey, 1988). Studies show that altering caloric consumption or expenditure in one context can trigger compensatory consumption or expenditure in other contexts with no net change in weight (Foltin et al., 1992; King et al., 2007; Whybrow et al., 2007).

Second, it is important to distinguish between **(a)** the effects of providing caloric information in any format versus providing no caloric information at all; from **(b)** the effects of providing caloric information in formats that would be compliant with R81.50 versus some other format.

---

[4] A standard, promulgated by the Federal Trade Commission, is to consider 'long-term' to be at least 2 years in the field of weight loss and obesity. See: http://www.ftc.gov/os/1997/12/d9261.htm. FTC states that when claims about evidence of long-term effects are made "said evidence shall, at a minimum, be based upon the experience of participants who were followed for a period of at least two years...".

Third, as my colleagues and I have recently discussed elsewhere (Faith et al., 2007), it is important to not conflate outcome variables. Such outcomes include: **(1)** the patron's stated or actual evaluation of the desirability of high-calorie food; **(2)** the caloric content of the meal the patron actually orders and eats in naturalistic setting; and **(3)** the weight and obesity prevalence of the restaurant's patrons, which depend on their calorie consumption and expenditure from all sources throughout multiple days.

Studies which measure an individual's *stated* (or real) intentions with respect to food purchase or consumption after receiving certain information are not necessarily indicative of what the individual will actually purchase and consume, especially over the long term and in natural settings. This can be because subjects do not actually know how they will behave in the future, because intentions are imperfect effectors of behavior, or because subjects know which answers experimenters want to hear and dutifully provide those verbal responses regardless of true intents or behaviors (Harnack et al., 2004). Studies which measure actual consumer purchase or consumption behavior are better, but are not yet as informative as studies which follow weight or obesity prevalence, since reduced consumption of calories in one setting may be counterbalanced by increased consumption or reduced expenditure in other setting as my colleagues and I have noted elsewhere (c.f., Faith et al., 2007).

For ease of exposition, using the distinctions elucidated above, I break the question posed in this section into 16 specific related questions in the table on the following page and therein summarize the evidence regarding each.

**Table 1.**

| | Effects of Providing Caloric Information in Any Format vs Not at All | | | Effects of Providing Caloric Information in the Format Required by RB1.50 vs Some Other Format | | |
|---|---|---|---|---|---|---|
| | Nearly Relevant Studies | Actually Relevant Studies | Level of Evidence[5] | Nearly Relevant Studies | Relevant Studies | Level of Evidence |
| **Short-Term Effects** | | | | | | |
| Stated intentions, attitudes, or preferences | Burton & Creyer (2004)[6], Conklin et al. (2005)[7], Kozup et al. (2003)[8], Yamamoto et al. (2005)[9] | Burton et al. (2006) | B | None | Possibly[10] Burton et al. (2006) | <D[11] |
| Actual Purchases and/or Consumption | Dubbert et al. (1984)[12] Sproul et al. (2003)[13] Aaron et al. (1995)[14] | Milch et al. (1976)[15] | <D[16] | None | None | <D*[17] |
| Total Daily Consumption | None | None | <D* | None | None | <D* |
| Weight or Body Fat | None | None | <D* | None | None | <D* |
| **Long-Term Effects** | | | | | | |
| Stated intentions, attitudes, or preferences | None | None | <D* | None | None | <D* |
| Actual Purchases and/or Consumption | None | None | <D* | None | None | <D* |
| Total Daily Consumption | None | None | <D* | None | None | <D* |
| Weight or Body Fat | None | None | <D* | None | None | <D* |

[5] Evidence levels are defined in the table reproduced on the following page.

[6] Not directly relevant because the independent variable is multiple bits of nutrition information, not just calorie content (see discussion below).

[7] Not a study of calories alone. Also not a randomized experiment. No control group.

[8] Not directly relevant because the independent variable is multiple bits of nutrition information, not just calorie content (see discussion below).

[9] Not directly relevant because the independent variable is calorie plus fat content, not just calorie content.

[10] I write "possibly" because it is unclear whether the comparison used is one that would be critical. The comparison entailed calorie information alone compared to calorie information with additional nutrition information and evaluated whether there was any interaction of the provided nutrition information with "context information" involving provision of recommended daily values (see discussion below).

[11] That is, the one possibly relevant study does not show consistent evidence supporting superiority of one method of providing calorie information relative to another.

[12] Only the foods with the lowest calories were labeled.

[13] Not directly relevant because the independent variable is multiple bits of nutrition information, not just calorie content.

[14] Not directly relevant because the independent variable is calorie and fat content, not just calorie content.

[15] This is not a randomized study, calorie information may have been confounded with price changes, and the statistical analysis was quite questionable.

[16] Dubbert et al "indicated [calorie] labeling did not change the total caloric content of meals," "Sproul et al. reported "Analysis of variance detected no significant differences in sales between baseline and the two intervention periods," and Aaron et al found that providing fat and calorie information *actually increased* calorie and fat intake.

[17] I use the notation "<D" to denote situations where I have been unable to identify even a "Blue Ribbon" panel endorsing the belief in the proposition, but should such a panel report be provided to or identified by me, I would, depending on the content, potentially change the rating from <D to D.

*National Heart, Lung, and Blood Institute Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults—the Evidence Report*

| Evidence category | Sources of evidence | Definition |
|---|---|---|
| A | Randomized controlled trials (rich body of data) | Evidence is from endpoints of well-designed RCTs (or trials that depart only minimally from randomization) that provide a consistent pattern of findings in the population for which the recommendation is made. Category A therefore requires substantial numbers of studies involving substantial numbers of participants. |
| B | Randomized controlled trials (limited body of data) | Evidence is from endpoints of intervention studies that include only a limited number of RCTs, post hoc or subgroup analysis of RCTs, or meta-analysis of RCTs. In general, Category B pertains when few randomized trials exist, they are small in size, and the trial results are somewhat inconsistent, or the trials were undertaken in a population that differs from the target population of the recommendation. |
| C | Nonrandomized trials observational studies | Evidence is from outcomes of uncontrolled or nonrandomized trials or from observational studies |
| D | Panel consensus judgment | Expert judgment is based on the panel's synthesis of evidence from experimental research described in the literature and/or derived from the consensus of panel members based on clinical experience or knowledge that does not meet the above-listed criteria. This category is used only in cases where the provision of some guidance was deemed valuable but an adequately compelling clinical literature addressing the subject of the recommendation was deemed insufficient to justify placement in one of the other categories (A through C). |

*Note.* See http://www.nhlbi.nih.gov/guidelines/obesity/ob_gdlns.htm. From *NHLBI Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults—the Evidence Report*, by the National Heart, Lung, and Blood Institute, 1998, Bethesda, MD: Author. Reprinted with permission. RCT = randomized clinical trial.

In Table 1, I have included every paper that the City, Dr. Frieden, and the amicus cited as supportive of the likely[18] efficacy of R81.50. In addition, I include several other papers that I was able to identify. I suspect there may be a few more papers available that could be uncovered with an exhaustive search, but I have been unable to identify any additional ones in the time available.

For example, the primary support relied on by the City and by Dr. Frieden as evidence that R81.50 will 'likely' have its intended effect on obesity are three papers by Burton and colleagues (Burton et al., 2006; Kozup et al., 2003; Burton & Creyer, 2004). Those studies report on the impact of providing nutritional information on consumers' attitudes to restaurant meals and/or self-reported willingness or intentions to purchase foods and have important methodological limitations. Perhaps most critically, they focus on the effects of providing a different sort of nutritional information than that required by Regulation 81-50, and cannot provide evidence regarding the effects (or lack thereof) of the specific practices that would be mandated by R81.50.

The 2003 and 2004 papers report several experiments on the effect of providing nutritional information to consumers regarding a hypothetical restaurant meal such as lasagna or pot roast. The authors report a positive impact of providing information on the fat, saturated fat, calories-from-fat and cholesterol levels of the meals. The calorie-only information required by R81.50 was not tested. The 2006 study did give some

---

[18] I note that both Dr. Frieden and the amicus use the term 'likely' and are quite clear in there language that R81.50 is only **likely** to be effective. They never state that there is evidence showing that it **will** be effective.

subjects calorie-only information and others the fat, cholesterol, etc information, and found no advantage to the calorie-only option. Each of the studies tested the impact of menu information by having subjects presented with a hypothetical menu complete a questionnaire on their subjective impressions after reading it, e.g., "How likely would you be to purchase this item given the information shown on the menu?" No meals were served, and actual purchases and consumption were not measured. Subjects' overall consumption and weight were not measured. Each study only measured the impact of information on a single occasion. Effects over days or weeks, and certainly impact on long-term weight management, was not tested. The studies focus on meals served at what the authors describe as "dinner house restaurants", Menu boards were not used to provide the nutritional information. Subject samples were not representative of the NYC population or the population of fast food diners, and response rates tended to be low suggesting concerns about generalizability of findings. The findings do not show that providing nutritional information at the type of restaurants generally subject to R81.50, and in the specific manner R81.50 requires, will be effective at all or more effective than alternative modes of providing nutritional information.

In brief, there is reasonably persuasive evidence (level B) that providing caloric information (vs no calorie information) will change stated purchase intentions in the short term. Beyond that, there is no body of data that showing that implementation of R81.50 would affect actual behavior or weight either in the short-term or long-term nor is there any body of evidence that the specific manner in which the R81.50 would require provision of caloric information would lead to better results in the short-term or long-term than any other method. **Thus, I conclude that there is not competent and reliable evidence that providing restaurant patrons with calorie information on menu items will**

reduce individual or population levels of obesity. **Nor is there evidence that the method of providing caloric information mandated by R81.50 will reduce levels of obesity more than the methods currently used by the affected restaurants to provide this information.** This does not imply that there is competent and reliable evidence that providing restaurant patrons with calorie information on menu items will not reduce individual or population levels of obesity. It simply implies that there is insufficient evidence to draw a conclusion.

### H.    Are There Reasons to Conjecture That There Might Be Unintended Deleterious Effects of the City's Proposed Rule?

Intuition might suggest that, at worst, R81.50 could do no harm to the public health. Dr. Frieden seems to share this intuition when he writes "And even in the unlikely event the calorie labeling regulation had little or no impact on consumer food choices, it is likely to increase the number of lower-calorie, and reduce the number of higher-calorie offerings these facilities provide. And even if the regulation neither changed consumer choices nor FSE offerings, there would be a salutary effect on increasing consumer awareness of calorie content." Nevertheless, it is important to note that the history of science, medicine, and psychology tells us that intuitions, even those of well-trained experts, are often wrong especially on issues involving human behavior (Dawes et al., 1989).

To take just a few examples, few people would argue that we should not try to prevent post-traumatic stress disorder (PTSD) among NYC rescue workers, families, and direct victims after the tragedy of September 11, 2001, teen suicide, adolescent eating disorders, and childhood sexual abuse. And yet, in each of these areas, evidence has emerged that the well-intentioned and intuitively sound efforts of professionals may

have some times done more harm than good (Carter et al., 1997; Callahan, 1996; Taal & Edelaar, 1997; McNally, 2003).

Closer to the specific issue herein and highlighted in a recent Associated Press report entitled "Nutrition education ineffective[19]," is a recent CDC-sponsored study (Centers for Disease Control and Prevention, 2006). In 2004-05 a program was implemented to "1) increase student access to fresh fruit and vegetables, 2) increase the degree of student preference for fruit and vegetables, and 3) increase fruit and vegetable consumption." Participating schools distributed free fresh fruit and vegetables to school children accompanied by nutrition education activities. Results showed a *decreased* preference for fruit and vegetables, belief that they could eat more vegetables, and willingness to try new fruit and vegetables among 5th-grade students. In other words, for these children, the seemingly innocuous intervention seemed to make things worse.

What harms (if any) might result from implementation of R81.50? That is difficult to predict. An interesting study by Boon et al. (2002) points to one possibility. Boon et al. found that when restrained eaters[20], who constitute 50% of the population according to the definition Boon et al. used, were both distracted by being asked to perform a cognitive task and also presented with information that the food they were eating was high in calories, they were **more** likely to overeat. To the extent that many NY diners consume food from restaurants while in a state of distraction or performing distracting

---

[19]  Nutrition education ineffective By Martha Mendoza, Associated Press. See: http://www.usatoday.com/news/health/2007-07-04-fightingfat_N.htm

[20] Restrained eaters are those that habitually tend to eat less than they want despite the availability of food.

tasks, we might hypothesize that the belief that the food is especially high in calories would trigger disinhibited increased consumption.

The study by Aaron et al. (1995) cited in Table 1 is especially germane. Aaron et al. "examined the influence of nutrition information on nutrient intakes at lunch in a college cafeteria...Experimental subjects (EXP, n=65) ate all mid-day meals in a student cafeteria over two weeks with identical meal cycles. Information on the energy and fat content of food items was displayed in the cafeteria in week two. ...Unexpectedly, EXP subjects had significantly increased total energy, grams fat, grams carbohydrate and decreased grams protein and % energy from protein in week two vs. week one." Thus, Aaron et al's results were opposite to the intention of providing nutrient and calorie information and *worsened* subjects' diets.

With respect to deleterious effects, other conceivabilities include (but are not limited to) creation of greater interest in foods seen as 'decadent' or 'forbidden' (Jansen et al., 2007), inadvertently encouraging patrons to consume lower calorie, but arguably less healthy choices (e.g., a food product that is largely refined sugar versus one that is largely protein), inadvertently encouraging patrons to consume lower calorie foods that subsequently lead to greater total caloric intake either because of poor satiating efficiency of the smaller calorie loads (Booth, 1988) and/or because of cognitively mediated reactivity to the label-induced perception of what one has eaten (Caputo & Mattes, 1993).

The foregoing does not by any means prove that there will be deleterious outcomes if R81.50 is implemented, but it shows that the conjecture is reasonable.

## I.    Summary.

In summation I believe that **(1)** the body of scientific evidence clearly supports the merit of concerns about obesity and suggests that as a society we should be seeking ways to reduce obesity and/or the deleterious effects it causes. **(2)** Though there are some limitations to the evidence available, on balance, the evidence can support the *conjecture* that provision of information about the calorie content of foods at the point of purchase in restaurants might be beneficial in reducing obesity levels. That being said, the evidence can equally support the conjecture that such action would be ineffective and possibly even deleterious; and **(3)** There is not competent and reliable evidence that providing restaurant patrons with calorie information on menu items will reduce individual or population levels of obesity. Nor is there evidence that the method of providing caloric information mandated by R81.50 will reduce levels of obesity more than the methods currently used by the affected restaurants to provide this information.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1742 that the foregoing is true and correct.

Executed on July 18, 2007

_____

David B. Allison, Ph.D.

# References

Aaron, R.E. Evans and D.J. Mela, Paradoxical effect of a nutrition labeling scheme in a student cafeteria, Nutrition Research 15 (1995) (9), pp. 1251–1261.

Allison DB, Cappelleri JC, Carpenter KM. Design and Analysis of Obesity Treatment and Prevention Trials (pp. 557-597). In S. Dalton (Ed.) Overweight and Weight Management. Gaithersburg, MD: ASPEN Publications, 1997.

Anderson, JW; FX Pi-Sunyer, E Danforth, CA Dujovne, F Greenway, JO Hill, CP Lucas, PM O'Neil, and DK Smith Clinical trial design for obesity agents: a workshop report. Obes Res 1998 6: 311-315.

Astrup AV, Rossner S, Sorensen TI. [Alternative causes of obesity] Ugeskr Laeger. 2006 Jan 9;168(2):135-7. [Article in Danish; Abstract in English].

Block JP, Scribner RA, DeSalvo KB. Fast food, race/ethnicity, and income: a geographic analysis. Am J Prev Med. 2004 Oct;27(3):211-7.

Boon B, Stroebe W, Schut H, Ijntema R. Ironic processes in the eating behaviour of restrained eaters. Br J Health Psychol. 2002 Feb;7(Pt 1):1-10.

Booth DA. Mechanisms from models--actual effects from real life: the zero-calorie drink-break option. Appetite. 1988;11 Suppl 1:94-102.

Boutelle KN, Fulkerson JA, Neumark-Sztainer D, Story M, French SA. Fast food for family meals: relationships with parent and adolescent food intake, home food availability and weight status. Public Health Nutr. 2007 Jan;10(1):16-23.

Bray GA, Champagne CM. Beyond energy balance: there is more to obesity than kilocalories. J Am Diet Assoc. 2005 May;105(5 Suppl 1):S17-23.

Burton, S., & Creyer, EH. (2004). What Consumers Don't Know Can Hurt Them: Consumer Evaluations and Disease Risk Perceptions of Restaurant Menu Items. Journal of Consumer Affairs 38 (1), 121–145.

Burton S, Creyer EH, Kees J, Huggins K. Attacking the obesity epidemic: the potential health benefits of providing nutrition information in restaurants. Am J Public Health. 2006 Sep;96(9):1669-75.

Callahan, J. Negative effects of a school suicide postvention program--a case example. Crisis, 17, 1996, 108-15.

Caputo FA, Mattes RD. Human dietary responses to perceived manipulation of fat content in a midday meal. Int J Obes Relat Metab Disord. 1993 Apr;17(4):237-40.

Carter, JC et al. Primary prevention of eating disorders: Might it do more harm than good? Int J Eat Disorders, 22, 1997, 167-72.

Centers for Disease Control and Prevention (CDC). Evaluation of a fruit and vegetable distribution program--Mississippi, 2004-05 school year. MMWR Morb Mortal Wkly Rep. 2006 Sep 8;55(35):957-61.

Committee for Proprietary Medicinal Products. Note for Guidance On Clinical Investigation of Drugs Used in Weight Control. The European Agency for the Evaluation of Medicinal Products, 1997.

Conklin, MT, Cranage, DA, & Lambert, CU. College students' use of point of selection nutrition information. Topics in Clinical Nutrition 20.2 (April-June 2005): p97(12).

Cummins SC, McKay L, MacIntyre S. McDonald's restaurants and neighborhood deprivation in Scotland and England. Am J Prev Med. 2005 Nov;29(4):308-10.

Dawes RM, Faust D, Meehl PE. Clinical versus actuarial judgment. Science. 1989 Mar 31;243(4899):1668-74.

Dubbert PM, Johnson WG, Schlundt DG, Montague NW. The influence of caloric information on cafeteria food choices. J Appl Behav Anal. 1984 Spring;17(1):85-92.

Duffey KJ, Gordon-Larsen P, Jacobs DR Jr, Williams OD, Popkin BM. Differential associations of fast food and restaurant food consumption with 3-y change in body mass index: the Coronary Artery Risk Development in Young Adults Study. Am J Clin Nutr. 2007 Jan;85(1):201-8.

Eisenmann JC. Insight into the causes of the recent secular trend in pediatric obesity: Common sense does not always prevail for complex, multi-factorial phenotypes. Prev Med. 2006 May;42(5):329-35.

Faith, M. S., Fontaine, K. R., Baskin, M. L., & Allison, D. B. (2007). Toward the reduction of population obesity: macrolevel environmental approaches to the problems of food, eating, and obesity. Psychological Bulletin, 133(2):205-226.

Foltin RW, Rolls BJ, Moran TH, Kelly TH, McNelis AL, Fischman MW. Caloric, but not macronutrient, compensation by humans for required-eating occasions with meals and snack varying in fat and carbohydrate. Am J Clin Nutr. 1992 Feb;55(2):331-42.

French SA, Harnack L, Jeffery RW. Fast food restaurant use among women in the Pound of Prevention study: dietary, behavioral and demographic correlates. Int J Obes Relat Metab Disord. 2000 Oct;24(10):1353-9.

French SA, Story M, Neumark-Sztainer D, Fulkerson JA, Hannan P. Fast food restaurant use among adolescents: associations with nutrient intake, food choices and behavioral and psychosocial variables. Int J Obes Relat Metab Disord. 2001 Dec;25(12):1823-33.

Gadbury, G. L., Coffey, C. S., & Allison, D. B. (2003). Modern Statistical Methods For Obesity Trial Data: Beyond LOCF. Obesity Reviews, 4, 175-184.

Green, M. D., Freedman, D. M., & Gordis, L. Reference Guide on Epidemiology. In Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2nd ed. 2000)                Available                at: http://www.fjc.gov/public/pdf.nsf/lookup/sciman06.pdf/$file/sciman06.pdf

Harnack L, Himes JH, Anliker J, Clay T, Gittelsohn J, Jobe JB, Ring K, Snyder P, Thompson J, Weber JL. Intervention-related bias in reporting of food intake by fifth-grade children participating in an obesity prevention study. Am J Epidemiol. 2004 Dec 1;160(11):1117-21.

Heindel JJ. Endocrine disruptors and the obesity epidemic. Toxicol Sci. 2003 Dec;76(2):247-9.

Hill JO, Thompson H, Wyatt H. Weight maintenance: what's missing? J Am Diet Assoc. 2005 May;105(5 Suppl 1):S63-6.

Jacobson P, Torgerson JS, Sjostrom L, Bouchard C. Spouse resemblance in body mass index: effects on adult obesity prevalence in the offspring generation. Am J Epidemiol. 2007 Jan 1;165(1):101-8.

Jansen E, Mulkens S, Jansen A. Do not eat the red food!: Prohibition of snacks leads to their relatively higher consumption in children. Appetite. 2007 Apr 7; [Epub ahead of print]

Jeffery RW, French SA. Epidemic obesity in the United States: are fast foods and television viewing contributing? Am J Public Health. 1998 Feb;88(2):277-80.

Keesey RE. The body-weight set point. What can you tell your patients? Postgrad Med. 1988 May 1;83(6):114-8, 121-2, 127.

King NA, Caudwell P, Hopkins M, Byrne NM, Colley R, Hills AP, Stubbs JR, Blundell JE. Metabolic and behavioral compensatory responses to exercise interventions: barriers to weight loss. Obesity (Silver Spring). 2007 Jun;15(6):1373-83.

Kozup, John C., Elizabeth H. Creyer and Scot Burton (2003), "Making Healthy Food Choices: The Influence of a Health Claim and Nutrition Information on Consumers' Evaluations of Packaged Food Products and Restaurant Menu Items," Journal of Marketing, April, 19-34.

McNally, RJ. Does early psychological intervention promote recovery from posttraumatic stress? Psychological Science in the Public Interest, 4, 2003.

Meinert, Curtis L. Clinical Trials: Design, Conduct and Analysis. Oxford University Press 1986.

Milich R, Anderson J, Mills M. Effects of visual presentation of caloric values on food buying by normal and obese persons. Percept Mot Skills. 1976 Feb;42(1):155-62.

Montori VM, Smieja M, Guyatt GH. Publication bias: a brief review for clinicians. Mayo Clin Proc. 2000 Dec;75(12):1284-8.

Muhlheim LS, Allison DB, Heshka S, Heymsfield SB. Do unsuccessful dieters intentionally underreport food intake? Int J Eat Disord. 1998 Nov;24(3):259-66.

Newbold RR, Padilla-Banks E, Snyder RJ, Phillips TM, Jefferson WN. Developmental exposure to endocrine disruptors and the obesity epidemic. Reprod Toxicol. 2007 Apr-May;23(3):290-6.

Pasarica M, Dhurandhar NV. Infectobesity: obesity of infectious origin. Adv Food Nutr Res. 2007;52:61-102.

Phipps SA, Burton PS, Osberg LS, Lethbridge LN. Poverty and the extent of child obesity in Canada, Norway and the United States. Obes Rev. 2006 Feb;7(1):5-12.

Reidpath DD, Burns C, Garrard J, Mahoney M, Townsend M. An ecological study of the relationship between social and environmental determinants of obesity. Health Place. 2002 Jun;8(2):141-5.

Saelens BE, Glanz K, Sallis JF, Frank LD. Nutrition Environment Measures Study in restaurants (NEMS-R): development and evaluation. Am J Prev Med. 2007 Apr;32(4):273-81.

Sanigorski AM, Bell AC, Swinburn BA. Association of key foods and beverages with obesity in Australian schoolchildren. Public Health Nutr. 2007 Feb;10(2):152-7.

Schroder H, Fito M, Isabel Covas M. Association of fast food consumption with energy intake, diet quality, body mass index and the risk of obesity in a representative Mediterranean population. Br J Nutr. 2007 Jul 12;:1-7

Shepherd LM, Neumark-Sztainer D, Beyer KM, Story M. Should we discuss weight and calories in adolescent obesity prevention and weight-management programs? Perspectives of adolescent girls. J Am Diet Assoc. 2006 Sep;106(9):1454-8.

Sproul AD, Canter DD, Schmidt JB. Does point-of-purchase nutrition labeling influence meal selections? A test in an Army cafeteria. Mil Med. 2003 Jul;168(7):556-60.

Stunkard A, Mazer A. Smorgasbord and obesity. Psychosom Med. 1978 Mar;40(2):173-5.

Taal, M & Edelaar, M. Positive and negative effects of a child sexual abuse prevention program. Child Abuse & Neglect, 21, 1997, 399-410.

Taveras EM, Sandora TJ, Shih MC, Ross-Degnan D, Goldmann DA, Gillman MW. The association of television and video viewing with fast food intake by preschool-age children. Obesity. 2006 Nov;14(11):2034-41.

Whybrow S, Mayer C, Kirk TR, Mazlan N, Stubbs RJ. Effects of two weeks' mandatory snack consumption on energy intake and energy balance. Obesity. 2007 Mar;15(3):673-85.

Yamamoto JA, Yamamoto JB, Yamamoto BE, Yamamoto LG. Adolescent calorie/fat menu ordering at fast food restaurants compared to other restaurants. Hawaii Med J. 2006 Aug;65(8):231-6.