UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE RESTAURANT ASSOCIATION, | No. 07-CIV-05710 (RJH) |
| Plaintiff, | |
| vs. | |
| NEW YORK CITY BOARD OF HEALTH, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, and Thomas R. Frieden, In His Official Capacity as Commissioner of the New York City Department of Health and Mental Hygiene, | |
| Defendants. | |

---

**BRIEF OF AMICI CURIAE CITY AND COUNTY OF SAN FRANCISCO, CITIES OF PHILADELPHIA, PENNSYLVANIA, BALDWIN PARK, CALIFORNIA, PALO ALTO, CALIFORNIA AND WEST HOLLYWOOD, CALIFORNIA; COUNTY OF LOS ANGELES, CALIFORNIA, KING COUNTY, WASHINGTON, AND MONTGOMERY COUNTY, MARYLAND; NATIONAL LEAGUE OF CITIES, NATIONAL ASSOCIATION OF COUNTY & CITY HEALTH OFFICIALS, INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, AND LEAGUE OF CALIFORNIA CITIES; CALIFORNIA STATE SENATORS ALEX PADILLA AND CAROLE MIGDEN, NEW YORK STATE ASSEMBLYMAN FELIX ORTIZ, CHICAGO ALDERMAN EDWARD M. BURKE, AND WASHINGTON D.C. COUNCILMEMBER PHIL MENDELSON, IN SUPPORT OF DEFENDANTS**

---

DENNIS J. HERRERA, State Bar #139669
City Attorney
DANNY CHOU, State Bar #180240
Chief of Appellate Litigation
RAFAL OFIERSKI, State Bar #194798
FRANCESCA GESSNER, State Bar #247553
Deputy City Attorneys
1 Dr. Carlton B. Goodlett Place, Room 234
San Francisco, California 94102-4682
Telephone:     (415) 554-4762
Facsimile:     (415) 554-4699
E-Mail:     francesca.gessner@sfgov.org
Attorneys for Amici Curiae
CITY AND COUNTY OF SAN FRANCISCO

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTERESTS OF AMICI CURIAE ........................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

    I.    OBESITY RATES ARE SOARING IN STATES AND CITIES ACROSS THE COUNTRY ......................................................................................... 3

    II.    THE OBESITY EPIDEMIC HAS ENORMOUS SOCIAL AND FISCAL COSTS FOR STATES AND LOCALITIES ...................................................... 5

    III.    STATE AND LOCAL LEGISLATURES ARE RESPONDING TO THE OBESITY EPIDEMIC WITH LEGISLATION REQUIRING RESTAURANTS TO DISCLOSE NUTRITIONAL INFORMATION ................ 7

ARGUMENT ........................................................................................................... 8

    I.    NUTRITION DISCLOSURE LEGISLATION LIKE REGULATION 81.50 IS A QUINTESSENTIAL EXERCISE OF STATE AND LOCAL POLICE POWER THAT CONGRESS NEVER INTENDED TO PREEMPT ...................................................................................................... 8

    II.    NUTRITION DISCLOSURE LEGISLATION IS SOUND PUBLIC POLICY. ........................................................................................................ 11

        A.    High Calorie Restaurant Foods Are A Growing Part of the American Diet ................................................................................... 12

        B.    Without Nutrition Information, Consumers Consistently Underestimate The Calorie Content Of Restaurant Foods ...................... 13

        C.    Calorie Content Is The Single Most Important Element of Nutrition Information For Obesity Prevention .......................................... 14

        D.    When Nutrition Information is Provided, Consumers Use It To Make Healthier Choices ......................................................................... 15

        E.    The Current Regime Of Voluntary Disclosure Is Ineffective .................... 17

        F.    There is a National Consensus That Providing Nutrition Information on Menus Is Likely to Provide Significant Public Health Benefits ....................................................................................... 19

CONCLUSION ....................................................................................................... 20

## TABLE OF AUTHORITIES

**Federal Cases**

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*
    447 U.S. 557 (1980).................................................................................... 11

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*
    467 U.S. 837 (1984).................................................................................... 11

*Desiano v. Warner-Lambert & Co.*
    467 F.3d 85 (2d Cir. 2006) ........................................................................... 8

*F.E.R.C. v. Mississippi*
    456 U.S. 742 (1982)...................................................................................... 9

*Hillsborough County v. Automated Med. Labs., Inc.*
    471 U.S. 707 (1985)...................................................................................... 8

*Med. Soc'y of the State of N.Y. v. Cuomo*
    976 F.2d 812 (2d Cir. 1992) .......................................................................... 8

*Medtronic, Inc. v. Lohr*
    518 U.S. 470 (1996)................................................................................. 8, 10

*Metro. Life Ins. Co. v. Massachusetts*
    471 U.S. 724 (1985)...................................................................................... 8

*Pelman v. McDonald's Corp.*
    237 F. Supp. 2d 512 (S.D.N.Y. 2003) ...................................... 3, 6, 12, 15

*Wis. Pub. Intervenor v. Mortier*
    501 U.S. 597 (1991)...................................................................................... 9

**State Statutes & Codes**

CHICAGO, ILL., HEALTH & SAFETY CODE ch. 7-38 (2006) ............................. 9

MINNEAPOLIS, MINN., HEALTH & SANITATION CODE § 234 (2007)................. 9

S.F., CAL., HEALTH CODE § 440 (2007) ......................................................... 9

**Other Authorities**

Brian Wansink & Pierre Chandon
    *Meal Size, Not Body Size, Explains Errors in Estimating Calorie Content of Meals*
    145 ANN. INTERN. MED. 326 (2006)............................................................ 14

Cynthia L. Ogden et al.,
*Prevalence of Overweight and Obesity in the United States, 1999-2004*
295 J. MED. ASS'N 1549 (2006) ............................................................................ 3

Eric A. Finkelstein et al.
*State-Level Estimates of Annual Medical Expenditures Attributable to Obesity*
12 OBESITY RESEARCH 18 (2004) ........................................................................ 6

Hu F., et al
*Diet, Lifestyle, and the Risk of Type 2 Diabetes Mellitus in Women*
345 NEW ENGLAND J. MED. 790 (2001) ............................................................. 6

Katherine M. Flegal et al.
*Excess Deaths Associated with Underweight, Overweight, and Obesity*
293 J. AM. MED. ASS'N 1861 (2005) .................................................................... 6

Lisa R. Young & Marion Nestle
*Expanding Portion Sizes in the U.S. Marketplace: Implications for Nutrition Counseling*
103 J. AM. DIETETIC ASS'N 231 (2003) ............................................................. 14

Martha T. Conklin, et al.
*College Students' Use of Point of Selection Nutrition Information*
2 TOPICS IN CLINICAL NUTRITION 20 (2005) .................................................. 16

Michael M. McCann
*Economic Efficiency and Consumer Choice Theory in Nutritional Labeling*
2004 WIS. L. REV. 1161 (2004) ............................................................................ 17

R. Milich, et al.
*Effects of Visual Presentation of Caloric Values on Food Buying by Normal and Obese Persons*
42 PERCEPTUAL AND MOTOR SKILLS 155 (1976) ......................................... 16

Rebecca S. Fribush
*Putting Calorie and Fat Counts on the Table: Should Mandatory Nutritional Disclosure Laws Apply to Restaurant Foods?*
73 GEO. WASH. L. REV. 377 (2005) .................................................................... 18

Scot Burton, et al.
*Attacking the Obesity Epidemic: The Potential Health Benefits of Providing Nutrition Information n Restaurants*
96 AM. J. PUB. HEALTH 1669 (2006) ................................................................. 14

**Other References**

Alan S. Levy & Brenda M. Derby
*The Impact of the NLEA on Consumers: Recent Findings from FDA's Food Label and*

*Nutrition Tracking System*
FDA Office of the Commissioner (1996) ........................................................................ 16

Biing-Hwan Lin, et al.
*Away-From-Home Foods Increasingly Important to Quality of American Diet*
U.S. DEP'T OF AGRIC., ECON. RESEARCH SERV., AGRICULTURE INFO. BULL. NO. 749 (1999)
*available at* http://www.ers.usda.gov/publications/aib749/aib749.pdf ................................... 13

Cal. Ctr. for Pub. Health Advocacy
*The Growing Epidemic: Childhood Overweight Rates on the Rise in California Assembly*
*Districts* (2005)
*available at* www.publichealthadvocacy.org/growingepidemic.html ...................................... 5

Cal. Dep't of Health Servs.
*California Children's Healthy Eating and Exercise Practices Survey* (2004)
*available at* http://www.dhs.ca.gov/ps/cdic/cpns/research/download/calcheeps/CalCHEEPS-
Low.pdf............................................................................................................................... 5

Cal. Dep't of Health Servs.
*The Economic Costs of Physical Inactivity, Obesity, and Overweight in California Adults:*
*Health Care, Workers' Compensation, and Lost Productivity* (2005)
*available at*
http://www.dhs.ca.gov/cdic/cpns/press/downloads/CostofObesityToplineReport.pdf .............. 7

CDC
*Behavioral Risk Factor Surveillance System Data* (2006)
http://apps.nccd.cdc.gov/brfss-smart/SelMMSAPrevData.asp..................................................... 5

CDC, *Behavioral Risk Factor Surveillance System Data* (2006)
http://apps.nccd.cdc.gov/brfss/ ................................................................................................ 4

CDC, Nat'l Ctr. for Health Statistics
*Healthy People 2000 Final Review* (2001) .......................................................................... 16

CDC, Nat'l Ctr. for Health Statistics
*National Diabetes Surveillance System, Prevalence of Diabetes (1980-2005)*
*available at* http://www.cdc.gov/diabetes/statistics/prev/national/tablepersons.htm ................ 6

CDC, *U.S. Obesity Trends 1985-2005,*
http://www.cdc.gov/nccdphp/dnpa/obesity/trend/maps/index.htm
(last visited Jul. 5, 2007)........................................................................................................ 4

INSTITUTE OF MEDICINE
PREVENTING CHILDHOOD OBESITY: HEALTH IN THE BALANCE
(Jeffrey P. Coplan et al. eds., 2004).............................................................................. 16, 19

JEFFREY R. BACKSTRAND, ET AL.
  FAT CHANCE, Center for Science in the Public Interest (1997) ................................................ 14

Los Angeles County Dep't of Health
  *Obesity on the Rise* (2003) *available at*
  http://lapublichealth.org/ha/reports/habriefs/lahealth073003_obes.pdf ................................ 5, 7

Press Release, Am. Med. Ass'n
  AMA Adopts Policies to Promote Healthier Food Options to Fight Obesity in America (June
  27, 2007)
  *available at* http://www.ama-assn.org/ama/pub/category/17768.html .................................... 19

The Keystone Ctr.
  *The Keystone Forum on Away-from-Home Foods: Opportunities for Preventing Weight Gain
  and Obesity* (2006), at 74 *available at*
  http://www.keystone.org/spp/documents/Forum_Report_FINAL_5-30-06.pdf
  ............................................................................................ 11, 12, 13, 14, 15, 16, 17, 18, 19

U.S. Dep't of Health and Human Servs., CDC, *Defining Overweight and Obesity, available at*
  http://www.cdc.gov/nccdphp/dnpa/obesity/defining.htm ........................................................ 3

U.S. Dep't of Health and Human Servs., Pub. Health Serv.
  *The Surgeon General's Call To Action To Prevent and Decrease Overweight and Obesity*
  (2001), *available at*
  http://www.surgeongeneral.gov/topics/obesity/calltoaction/CalltoAction.pdf
  ................................................................................................................................ 4, 5, 19

U.S. Food and Drug Administration (FDA)
  *Calories Count: Report of the Working Group on Obesity* (2004), at Part II(B)
  *available at* http://www.cfsan.fda.gov/~dms/owg-toc.html ................................... 11, 14, 17, 19

UCLA Ctr. for Health Policy Research
  *California Health Interview Survey*
  http://www.chis.ucla.edu ...................................................................................................... 5

**Proposed Legislation**

A.B. 1693, 212th Leg., 2006 Sess., § 1 (N.J. 2006) ................................................................ 7, 16

H.B 389, 95th Gen. Assemb. § 5(7) (Ill. 2007) ......................................................... 10, 12, 14, 16

H.B. 54, 24th Leg. § 1 (Haw. 2007) .................................................................... 10, 12, 14, 16, 18

S.B. 120, 2007-08 Reg. Sess. § 1(h) (Cal. 2007)................................................. 7, 10, 12, 16, 18

S.B. 1290, 185th Sess. § 2(g) (Mass. 2007)......................................................... 10, 12, 13, 14, 16

## INTEREST OF AMICI CURIAE

Amici curiae City and County of San Francisco, Cities of Philadelphia, Pennsylvania, Baldwin Park, California, Palo Alto, California and West Hollywood, California; County of Los Angeles, California, King County, Washington, and Montgomery County, Maryland; National League of Cities ("NLC"), National Association of County & City Health Officials ("NACCHO"), International Municipal Lawyers Association ("IMLA"), and League of California Cities ("LCC"); California State Senators Alex Padilla and Carole Migden, New York State Assemblyman Felix Ortiz, Chicago Alderman Edward M. Burke, and Washington D.C. Councilmember Phil Mendelson, submit this brief in support of Defendants New York City Board of Health, New York City Department of Health and Mental Hygiene, and Thomas R. Frieden, in his official capacity as Commissioner of the New York City Department of Health and Mental Hygiene (collectively "New York City").

The National League of Cities ("NLC") is the country's largest and oldest organization serving municipal government, with more than 1,600 direct member cities and 49 state municipal leagues that collectively represent more than 18,000 United States communities. Founded in 1924, NLC strengthens local government through research, information sharing, and advocacy on behalf of hometown America.

The International Municipal Lawyers Association is a non-profit, nonpartisan, professional organization consisting of more than 1,400 members comprised of local government entities, including cities and counties, and subdivisions thereof, as represented by their chief legal officers; state municipal leagues; and individual attorneys who represent municipalities, counties, and other local government entities.

The League of California Cities is an association of 478 California cities dedicated to protecting and restoring local control to provide for the public health, safety, and welfare of their residents, and to enhance the quality of life for all Californians.  The League is advised by its Legal Advocacy Committee, which is comprised of 24 city attorneys from all regions of the

State. The Committee monitors litigation of concern to municipalities, and identifies those cases that are of statewide – or nationwide – significance. The Committee has identified this case as being of such significance.

The cities and counties on this brief are on the front lines in the battle against the obesity epidemic. Many of them have introduced or are considering introducing nutrition disclosure legislation similar to New York City's Regulation 81.50. The legislators on this brief have all sponsored such legislation.

Thus, amici share a common interest in supporting New York City's effort to address the rapidly growing public health crisis of obesity by requiring disclosure of nutrition information for restaurant foods. Rising obesity rates are a matter of urgent concern in states, counties, and cities across the country. New York City is not alone in its conclusion that consumers should be provided with point of purchase access to nutritional information when eating out in order to help them make better informed choices involving their health and diet. In fact, an adverse ruling in this case would undermine pending legislation in state and local legislatures across the country. In the last year, fourteen states – Arizona, California, Connecticut, Hawaii, Illinois, Maine, Massachusetts, Michigan, New Jersey, New Mexico, New York, Pennsylvania, Tennessee, and Vermont – and three major cities – Chicago, Philadelphia and Washington D.C. – have introduced nutrition labeling legislation similar to New York City's Regulation 81.50. *See* Amici Curiae's Request for Judicial Notice (RJN), Exh. A-R.[1] Numerous other cities and counties, including Boston, King County, WA, Minneapolis, Montgomery County, MD, and Nassau County, NY, are considering introducing similar legislation and regulations.

---

[1] The bill introduced in the Hawaii legislature does not require disclosure of nutritional information directly on menus or menu boards. It requires restaurants to post a sign that brochures with nutritional information are available upon request. *See* RJN, Exh. F.

Amici file this brief to highlight two points.  First, the New York State Restaurant Association (NYSRA) ignores that nutrition disclosure legislation like Regulation 81.50 falls squarely within the broad police powers that state and local governments historically have exercised in the public health domain – a fact critical to the preemption analysis in this case.  Second, and contrary to NYSRA's assertions, nutrition labeling legislation is sound public policy supported by sound science.  Notwithstanding NYSRA's attempt to characterize Regulation 81.50 as "irrational," Pl. Br. at 7, nutrition disclosure legislation reflects a national consensus shared by the federal Food and Drug Administration (FDA), state and local governments, and health experts that providing restaurant customers with the information they need to make healthful eating choices is a useful tool in reducing obesity.  Regulation 81.50 therefore is a valid exercise of local police power and should be upheld.

## FACTUAL BACKGROUND

I.    OBESITY RATES ARE SOARING IN STATES AND CITIES ACROSS THE COUNTRY

Obesity is a serious and growing public health crisis affecting states and localities across the country. [2]  Over the last 25 years, obesity rates have doubled among U.S. adults and tripled among children and teens. [3]  In the last decade, obesity rates have increased in *every* state in the

---

[2] The Centers for Disease Control and Prevention (CDC) uses the terms "overweight" and "obesity" as "labels for ranges of weight that are greater than what is generally considered healthy for a given height."  U.S. Dep't of Health and Human Servs., CDC, *Defining Overweight and Obesity, available at* http://www.cdc.gov/nccdphp/dnpa/obesity/defining.htm.  An adult who has a Body Mass Index (BMI) between 25 and 29.9 is considered overweight.  An adult who has a BMI of 30 or higher is considered obese.  *Id.*

[3] Cynthia L. Ogden et al., *Prevalence of Overweight and Obesity in the United States, 1999-2004*, 295 J. MED. ASS'N 1549, 1549-55 (2006); *see also Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 519-20 (S.D.N.Y. 2003) (summarizing rising obesity rates among adults and children).

nation.[4]  In 1995, less than 20% of adults were obese in each of the fifty states.  Just ten years

later in 2005, less than 20% of adults were obese in only *four* states, while in seventeen states,

25% or more of adults were obese.[5]

In all of the fourteen states that have introduced nutrition labeling legislation, obesity

rates have surged in recent years.  Since 1991, the percentage of obese adults in these states

increased as follows:  In Arizona, it doubled to 23% of the adult population; California – doubled

to 23%; Connecticut – nearly doubled to 21%; Hawaii – nearly doubled to 21%; Illinois –

doubled to 25%; Maine – doubled to 23%; Massachusetts – nearly tripled to 20%; Michigan –

nearly doubled to 29%; New Jersey – nearly tripled to 23%; New Mexico – nearly tripled to

23%; New York – doubled to 23%; Pennsylvania – doubled to 24%; Tennessee – nearly tripled

to 29%; Vermont – nearly doubled to 21%.[6]

When the number of people who are overweight is added to those who are obese, the

figures are even more shocking.  For example, in Michigan and Tennessee, 65% of adults are

obese or overweight.[7]  In Arizona, New Jersey and New Mexico, at least 60% of adults are

overweight or obese.  *Id.*  In California, another state with pending menu labeling legislation,

59% of adults are obese or overweight and more than one third of children are overweight or at

---

[4] U.S. Dep't of Health & Human Servs., Pub. Health Serv., *The Surgeon General's Call To Action To Prevent and Decrease Overweight and Obesity* (2001), *available at* http://www.surgeongeneral.gov/topics/obesity/calltoaction/CalltoAction.pdf.

[5] The Centers for Disease Control and Prevention (CDC), *U.S. Obesity Trends 1985-2005*, http://www.cdc.gov/nccdphp/dnpa/obesity/trend/maps/index.htm (last visited Jul. 5, 2007).

[6] *Id.* (follow "PowerPoint slide presentation format" hyperlink);  CDC, *Behavioral Risk Factor Surveillance System Data* (2006), http://apps.nccd.cdc.gov/brfss/.

[7] CDC, *Behavioral Risk Factor Surveillance System Data* (2006), http://apps.nccd.cdc.gov/brfss/.

risk of being overweight.[8]  In Massachusetts, the state with the *lowest* rate among the fourteen states, 56% of adults are obese or overweight.  *Id.*

The statistics for individual cities are similarly alarming.  In the three cities that introduced nutrition labeling legislation in the last year – Chicago, District of Columbia and Philadelphia – more than 50% of adults were obese or overweight as of 2005.[9]  In Los Angeles County, 55% of adults were overweight or obese as of 2003, and 23% of school children are obese or overweight.[10]  Similarly, in San Francisco, 43% percent of adults are overweight or obese and 25% of children are overweight.[11]

## II.    THE OBESITY EPIDEMIC HAS ENORMOUS SOCIAL AND FISCAL COSTS FOR STATES AND LOCALITIES

Although the obesity epidemic is national in scope, its human and financial impact is experienced on the local level by states and cities.  Obesity places a huge burden on states and localities that is manifested in premature death and disability, staggering health care costs, and lost productivity.[12]  A 2005 study by the Centers for Disease Control and Prevention (CDC) estimated that approximately 112,000 deaths are associated with obesity each year in the United

---

[8] *Id.*; Cal. Dep't of Health Servs., *California Children's Healthy Eating and Exercise Practices Survey* (2004), *available at* http://www.dhs.ca.gov/ps/cdic/cpns/research/download/calcheeps/CalCHEEPS-Low.pdf.

[9] Prevalence rates of obesity and overweight in those metropolitan areas were as follows: Chicago, 58%; District of Columbia, 54 %; Philadelphia, 59%. CDC, *Behavioral Risk Factor Surveillance System Data* (2006), http://apps.nccd.cdc.gov/brfss-smart/SelMMSAPrevData.asp.

[10] Los Angeles County Dep't of Health, *Obesity on the Rise* (2003), *available at* http://lapublichealth.org/ha/reports/habriefs/lahealth073003_obes.pdf.; Personal Communication, Los Angeles County Dep't of Pub. Health (June 22, 2007).

[11] UCLA Ctr. for Health Policy Research, *California Health Interview Survey*, http://www.chis.ucla.edu/; Cal. Ctr. for Pub. Health Advocacy, *The Growing Epidemic: Childhood Overweight Rates on the Rise in California Assembly Districts* (2005), *available at* www.publichealthadvocacy.org/growingepidemic.html.

[12] *See* U.S. Dep't of Health & Human Servs., *supra* note 4.

States, making obesity the second leading contributor to premature death, behind only tobacco.[13]
Increasing obesity rates have led to increasing diabetes rates. As of 2005, 15.8 million
Americans had diabetes, almost triple the number from 1980.[14] Between 50% and 80% of
diabetes cases are associated with obesity, unhealthy eating and physical inactivity.[15]

The financial cost of obesity is enormous. As this Court explained in another case, "In
2000, the cost of obesity was estimated to be $117 billion. Most of the costs associated with
obesity arise from type 2 diabetes, coronary heart disease and hypertension." *Pelman v.
McDonald's Corp.*, 237 F. Supp. 2d 512, 520 (S.D.N.Y. 2003). State governments pay a large
portion of the health care costs associated with the obesity epidemic. In the fourteen states that
have introduced nutrition disclosure legislation, their annual medical expenditures attributable to
obesity from state Medicare and Medicaid funds are estimated as follows: Arizona – $396
million; California – $3.5 billion; Connecticut – $665 million; Hawaii – $120 million; Illinois –
$1.8 billion; Maine – $203 million; Massachusetts – $1.1 billion; Michigan – $1.6 billion; New
Jersey – $1.2 billion; New Mexico – $135 million; New York – $4.9 billion; Pennsylvania – $2.4
billion; Tennessee – $921 million; Vermont – $69 million.[16] When other expenditures are taken
into account, the numbers are even more staggering. According to the California Department of
Health Services, the obesity epidemic cost the private and public sectors in the state of California
an estimated $28 *billion* in direct medical expenses, workers' compensation, and lost productivity

---

[13] Katherine M. Flegal et al., *Excess Deaths Associated with Underweight, Overweight,
and Obesity*, 293 J. AM. MED. ASS'N 1861, 1861-67 (2005).

[14] CDC, Nat'l Ctr. for Health Statistics, *National Diabetes Surveillance System,
Prevalence of Diabetes (1980-2005), available at*
http://www.cdc.gov/diabetes/statistics/prev/national/tablepersons.htm.

[15] Hu F., et al, *Diet, Lifestyle, and the Risk of Type 2 Diabetes Mellitus in Women*, 345
NEW ENGLAND J. MED. 790-97 (2001).

[16] Eric A. Finkelstein et al., *State-Level Estimates of Annual Medical Expenditures
Attributable to Obesity*, 12 OBESITY RESEARCH 18, 22-23 (2004).

in 2005.[17]  The epidemic cost Los Angeles County an estimated $3.43 billion annually in health care expenditures, and San Francisco an estimated $192 million a year in medical expenses, lost productivity and workers' compensation.[18]  In sum, the obesity epidemic is generating extraordinary costs for states and cities alike.

## III.  STATE AND LOCAL LEGISLATURES ARE RESPONDING TO THE OBESITY EPIDEMIC WITH LEGISLATION REQUIRING RESTAURANTS TO DISCLOSE NUTRITIONAL INFORMATION

In the face of the alarming rise in obesity and the resulting social and economic costs, states and local governments across the country have been taking action.  As discussed above, fourteen states have already introduced nutrition disclosure legislation similar to Regulation 81.50.  *See* RJN, Exh. A-P.  With the previously noted exception of Hawaii, all of these bills would require chain restaurants and/or fast food outlets to list calories and/or other nutrition information for standard menu items directly on menus and/or menu boards.  *See* RJN, Exh. A-D, F-P.  These proposed laws reflect a determination on the part of these states that "it is in the public's interest to enable families to make more informed choices about significant parts of their diets and help reduce the problem of overweight and obesity in the State."  RJN, Exh. J at § 1 (N.J. Assemb. B. 1693); *see also* RJN, Exh. B at § 1(h) (Cal. S.B. 120) (stating that the bill's purpose is "to provide consumers with better access to nutritional information about prepared foods sold at food facilities so that consumers can understand the nutritional value of available foods").  Cities and counties are also taking action.  Philadelphia and Washington D.C. have

---

[17] Cal. Dep't of Health Servs., *The Economic Costs of Physical Inactivity, Obesity, and Overweight in California Adults: Health Care, Workers' Compensation, and Lost Productivity* (2005), *available at* http://www.dhs.ca.gov/cdic/cpns/press/downloads/CostofObesityToplineReport.pdf.

[18] For the Los Angeles figure, see Los Angeles County Dep't of Health, *supra* note 10. The San Francisco figure was generated by the San Francisco Department of Public Health by extrapolating from a report by the California Department of Health Services.  *See* Cal. Dep't of Health Servs., *supra* note 17.

introduced bills that would require chain restaurants to provide nutritional information for menu items on menus and/or menu boards. [19]  *See* RJN, Exh. Q-R.  In addition, several other localities including Boston, King County, WA,[20] Minneapolis, Montgomery County, MD, and Nassau County, NY are considering introducing such legislation.

## ARGUMENT

**I.    NUTRITION DISCLOSURE LEGISLATION LIKE REGULATION 81.50 IS A QUINTESSENTIAL EXERCISE OF STATE AND LOCAL POLICE POWER THAT CONGRESS NEVER INTENDED TO PREEMPT**

Current state and local legislative efforts to combat the obesity epidemic continue a long tradition of public health regulation at the state and local level.  As amici curiae Public Citizen, et al. also discuss, public health historically has been a domain of state and local authorities, not the federal government.  *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985).  Indeed, "[t]he regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state." *Med. Soc'y of the State of N.Y. v. Cuomo*, 976 F.2d 812, 816 (2d Cir. 1992).  Consistent with their "historic primacy" in the field of public health, state and local governments enjoy "great latitude" under their police powers to legislate for the protection of the public. *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) and *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)).  Restaurants and restaurant food have long been the subject of extensive state and local police power regulation.  State and local governments have established standards for storing and preparing food, operating kitchens, and

---

[19] A menu labeling ordinance was introduced in the Chicago City Council on December 13, 2006 but is no longer actively pending.  The sponsor of the Chicago ordinance, Alderman Edward M. Burke, is one of the signatories to this brief.

[20] The King County Board of Health has proposed a regulation to require menu labeling which is attached hereto as Exhibit S.  *See* RJN, Exh. S.  King County is one of the signatories to this brief.

restaurant employee hygiene, and enacted other measures affecting restaurant operation, such as smoking bans. *See, e.g.,* S.F., CAL., HEALTH CODE § 440 (2007) (sanitation and safety regulations for restaurants); CHICAGO, ILL., HEALTH & SAFETY CODE ch. 7-38 (2006) (same); MINNEAPOLIS, MINN., HEALTH & SANITATION CODE § 234 (2007) (prohibiting smoking in restaurants). Legislative and regulatory measures requiring restaurants to provide nutritional information so that their customers may make informed and healthful choices – like Regulation 81.50 and the various impending measures described above – likewise fall squarely within the broad police powers that state and local governments historically have exercised in the public health domain without federal interference.

The long tradition of public health regulation at the state and local level reflects the policy-making authority and responsibilities that state and local governments hold in our federalist system. In this system, the sovereign states and their local subdivisions serve as "laboratories" for the development of new ideas across the spectrum of public policy. *F.E.R.C. v. Mississippi*, 456 U.S. 742, 788 (1982). "This state innovation is no judicial myth." *Id.* In their role as public policy innovators, state and local governments have enacted environmental laws, minimum wage laws, utility regulations, and countless other measures that either fill a regulatory void or supplement existing federal standards to create a regulatory partnership between federal, state and local governments. *Id.* at 788-89; *see also Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 615 (1991). Public health is another field where state and local governments usefully serve as laboratories for developing new and innovative approaches to problems such as the current obesity epidemic. Given that they bear the brunt of the economic and social costs of this epidemic and are on the frontlines in the battle against the epidemic, state and local governments are in the best position to study and develop effective regulatory solutions to this public health crisis.

Recognizing this, Congress has declined to limit state and local regulation of nutrition labeling for restaurant food except in narrow circumstances not applicable here. As New York

City and amici Public Citizen et al. explain more fully in their briefs, the only preemption issue in this case is the scope of the Nutrition Labeling and Education Act of 1990 (NLEA)'s express preemption clause because Congress disavowed any intent to preempt state and local regulation by implication. Thus, the NLEA does not displace a state or local enactment unless that was the "clear and manifest" purpose of Congress. *Medtronic*, 518 U.S. at 485 (internal citation omitted). And as New York City and Public Citizen persuasively argue, the plain language of the narrowly drawn preemption clause, the overall statutory framework and the legislative history of the NLEA exhibit no "clear and manifest" Congressional purpose to preclude states and localities from exercising their traditional authority to develop new, innovative measures – such as New York's Regulation 81.50 – to combat the obesity epidemic. To the contrary, all the available evidence of legislative intent compels the conclusion that, after carefully considering the matter, Congress decided not to preempt any state or local law establishing nutritional information requirements for restaurants.

Indeed, as the state and local governments that have proposed nutrition disclosure legislation recognize, "[t]he NLEA exempts restaurants from the labeling requirement unless restaurants make a nutrient content claim … or health claim." RJN, Exh. C at 4 (CAL. ASSEMB. COMM. ON HEALTH, ANALYSIS OF CALIFORNIA UNIFORM RETAIL FOOD FACILITIES LAW, S.B. 120); *see also* RJN, Exh. E at § 1 (Haw. H.B. 54) (same); RJN, Exh. F at § 5(7) (Ill. H.B 389) (same); RJN, Exh. H at § 2(g) (Mass. S.B. 1290) (same). Moreover, as the FDA-commissioned Keystone Report confirms, "the FDA does not have regulatory authority to require nutrition information in restaurants … and state legislatures *do* have the authority to require the provision of nutrition information."[21] The regulatory gap in the NLEA – where every restaurant and every

---

[21] The Keystone Ctr., *The Keystone Forum on Away-from-Home Foods: Opportunities for Preventing Weight Gain and Obesity* (2006), at 74, *available at* http://www.keystone.org/spp/documents/Forum_Report_FINAL_5-30-06.pdf ("Keystone Report") (emphasis added). The FDA itself acknowledges that the NLEA does not require (continued on next page)

restaurant chain in the country may decide for itself what nutritional information, if any, to provide to its customers – is the antithesis of a comprehensive, uniform regulatory system displacing all other regulation. The limited scope of the NLEA shows that Congress intended to let state and local governments develop their own regulatory measures based on local concerns and experience. In doing so, Congress acted consistently with the historic primacy of state and local governments in matters of public health, and the federalist principle that states and localities are useful laboratories for developing regulatory responses to problems which, like the obesity epidemic, are felt most directly at the local level.

## II.    NUTRITION DISCLOSURE LEGISLATION IS SOUND PUBLIC POLICY

Not only is nutrition disclosure legislation like Regulation 81.50 consistent with basic principles of federalism and state and local governments' police power to protect the public health, it is also sound public policy supported by sound science. [22]

Notwithstanding NYSRA's claim that nutrition disclosure legislation is an "irrational" "social science experiment" for which "there is no public health consensus," Pl. Br. at 3, 4, 7,

---

(footnote continued from previous page)

restaurants "to provide nutrition information for a menu item or meal unless a nutrient content claim or a health claim is made for such item or meal." U.S. Food and Drug Administration (FDA), *Calories Count: Report of the Working Group on Obesity* (2004), at Part II(B), *available at* http://www.cfsan.fda.gov/~dms/owg-toc.html ("*FDA Calories Count Report*"). This interpretation is entitled to great deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984) (holding that it has been "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

[22] In addition to its federal preemption claim, NYSRA asserts that Regulation 81.50 violates the First Amendment rights of restaurants. As New York City argues, and NYSRA appears to concede, *see* Pl. Br. 24-25, the test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 566 (1980) does not apply here. However, even if this Court were to conclude that it did, this section demonstrates why Regulation 81.50 would survive scrutiny under the third and fourth prongs of that test.

none other than the U.S. Surgeon General, the FDA, the National Academies' Institute of Medicine and the American Medical Association have all recommended nutritional labeling of restaurant foods as a useful strategy for addressing obesity. *See infra* Sec. II(F). Thus, Regulation 81.50 in fact reflects a growing national consensus among federal agencies, state and local legislatures, and science and health experts that such legislation is likely to yield significant health and economic benefits by providing consumers with the information they need to make better informed choices and decrease their risk for obesity.

**A.    High Calorie Restaurant Foods Are A Growing Part of the American Diet**

As several of the restaurant nutrition labeling bills introduced in state legislatures recognize, the rise in obesity rates in the United States has coincided with the increased consumption of away-from-home foods. *See* RJN, Exh. B at § 1(e) (Cal. S.B. 120); RJN, Exh. C at 4-5 (CAL. ASSEMB. COMM. ON HEALTH, ANALYSIS OF CALIFORNIA UNIFORM RETAIL FOOD FACILITIES LAW, S.B. 120); RJN, Exh. E at § 1 (Haw. H.B. 54); RJN, RJN, Exh. F at § 5(e) (Ill. H.B. 389); RJN, Exh. H at § 2(e) (Mass. S.B. 1290). Whereas in 1970 Americans spent just 26% of their food budget on food prepared away from home, they now spend almost half (46%) of their food dollars on such items. *See Keystone Report*, at 122. Away-from-home foods provided 34% of daily total caloric intake in 1995 (nearly double the 18% in 1977-78). *Id.* at 30, 122; *see also Pelman*, 237 F. Supp. 2d at 518 (discussing the prevalence of consumption of away-from home food).

Crucially, restaurant meals typically have larger portions and are higher in calories than home-prepared foods. *Keystone Report*, at 122; *see also* RJN, Exh. H at § 2(f) (Mass. S.B. 1290). The United States Department of Agriculture has observed that away-from-home foods have lower nutritional quality than home foods and found a correlation between increased caloric

intake and eating out.[23]  Similarly, the FDA-commissioned Keystone Report observed that "[e]ating out more frequently is associated with obesity, higher body fatness, and higher body mass index." *Keystone Report*, at 27.

**B.    Without Nutrition Information, Consumers Consistently Underestimate The Calorie Content Of Restaurant Foods**

While Americans are eating out more than ever before and restaurant foods tend to have higher calorie counts than home-cooked meals, consumers consistently underestimate the number of calories in menu items.  As the FDA-commissioned Keystone Report concluded, "[w]ithout nutrition information, consumers typically are unable to assess the caloric content of foods." *Keystone Report*, at 68, 73.  For example, few people would guess that a smoked turkey sandwich (930 calories) at Chili's has more calories than a sirloin steak (540 calories).  Or that a large milk shake from McDonald's has over 1,000 calories, about half the daily recommended amount.  Or that two jelly-filled doughnuts at Dunkin' Donuts have fewer calories than a sesame bagel with cream cheese.  In fact, a March 2007 poll conducted in California found that an overwhelming number of Californians are unable to identify fast food and restaurant menu items with the fewest/most calories, salt, or fat.[24]  Another study found that calories in restaurant items were almost *two times* more than what consumers expected.[25]  And yet another study demonstrated that even trained nutrition professionals cannot accurately estimate the calorie

---

[23] *See* Biing-Hwan Lin, et al., *Away-From-Home Foods Increasingly Important to Quality of American Diet*, U.S. DEP'T OF AGRIC., ECON. RESEARCH SERV., AGRICULTURE INFO. BULL. NO. 749 (1999), *available at* http://www.ers.usda.gov/publications/aib749/aib749.pdf.

[24] Cal. Ctr. for Pub. Health Advocacy, statewide poll conducted on March 20-31, 2007 by Field Research Corporation of 523 registered California voters, available at www.publichealthadvocacy.org/menulabelingpoll.html.

[25] Scot Burton, et al., *Attacking the Obesity Epidemic: The Potential Health Benefits of Providing Nutrition Information n Restaurants*, 96 AM. J. PUB. HEALTH 1669, 1669-75 (2006).

content of typical restaurant meals.[26]  Indeed, they consistently underestimated calories by 200 to 600 calories.  *Id*.  Moreover, steadily increasing portion sizes in restaurant meals make consumers even more likely to underestimate calorie content.[27]  These studies confirm that there is an urgent need for restaurant customers to have access to calorie information at the point of sale.

**C.    Calorie Content Is The Single Most Important Element of Nutrition Information For Obesity Prevention**

The fact that consumers substantially underestimate calorie counts in restaurant food is significant because, as the FDA's Obesity Working Group concluded in 2004, "a focus on total calories is *the most useful single piece of information* in relation to managing weight."  *FDA Calories Count Report* at Part V(B) (emphasis added).  Contrary to NYSRA's claim that "displaying calories in isolation will inaccurately overemphasize the importance of calories to a well-balanced diet," Pl. Br. at 7, the FDA and other nutrition experts agree that "calorie information is *most* relevant to obesity prevention." *Keystone Report*, at 80 (emphasis added).  State legislatures have also recognized that calories are key.  *See* RJN, Exh. E at § 1 (Haw. H.B. 54) ("Increased calorie intake is a key contributor to the alarming increase in obesity."); Exh. F at § 5(b) (Ill. H.B. 389) (same); Exh. H at § 2(b) (Mass. S.B. 1290) (same).  Given the fact that calories are the most important nutrition information for consumers to consider when managing their weight, Regulation 81.50's focus on calorie information to the exclusion of other nutrient information is more than reasonable.

---

[26] JEFFREY R. BACKSTRAND, ET AL., FAT CHANCE, Center for Science in the Public Interest (1997).

[27] *See* Lisa R. Young & Marion Nestle, *Expanding Portion Sizes in the U.S. Marketplace: Implications for Nutrition Counseling*, 103 J. AM. DIETETIC ASS'N 231, 231-34 (2003); Brian Wansink & Pierre Chandon, *Meal Size, Not Body Size, Explains Errors in Estimating Calorie Content of Meals*, 145 ANN. INTERN. MED. 326, 326-32 (2006).

**D.    When Nutrition Information is Provided, Consumers Use It To Make Healthier Choices**

There is ample evidence that when consumers are provided with nutritional information, they often make healthier choices. As this Court has observed, in the context of fast food consumption, "knowledge is power." *Pelman*, 237 F. Supp. 2d at 517-18 (observing that "consumers cannot be expected to protect against a danger that was solely within McDonalds' knowledge").

NYSRA claims that there is "no public health consensus on how consumers use nutrition information." Pl. Br. at 4. To support this claim, NYSRA quotes selectively one paragraph from the FDA-commissioned Keystone Report which states that more research is needed on how consumers use nutrition information. *Id.* This citation is entirely misleading, however, for two reasons. First, NYSRA fails to mention that just one page earlier, the Keystone Report recommends that restaurants "should provide consumers with calorie information in a standard format that is easily accessible and easy to use." *Keystone Report*, at 12. Second, NYSRA omits the report's conclusion that "while the knowledge base needs to be improved, enough is known to recommend many important actions. ... reasonable strategies to assist consumers with healthy energy intake *should be pursued now*, and then augmented going forward as new information becomes available." *Id.* at 29 (emphasis added). Similarly, the Institute of Medicine's 2004 report on childhood obesity concluded that because "[t]he obesity epidemic is a serious public health problem that calls for *immediate* action to reduce its prevalence as well as its health and social consequences ... actions should be based on the best available evidence—as opposed to waiting for the best possible evidence."[28]

---

[28] INSTITUTE OF MEDICINE, PREVENTING CHILDHOOD OBESITY: HEALTH IN THE BALANCE (Jeffrey P. Coplan et al. eds., 2004) (emphasis added).

The best available evidence reveals that disclosure of nutritional information is likely to influence consumer choice. As several of the bills currently pending in state legislatures point out,[29] (1) three-quarters of American adults report using nutritional labels on packaged foods, (2) studies show that use of food labels is associated with eating more healthful diets, and (3) almost half of consumers report that nutrition information on food labels has caused them to change their minds about buying a food product.[30]

In addition to the studies cited by New York City in the Notice of Adoption for Regulation 81.50, numerous other studies demonstrate the material impact of nutrition information on consumer behavior. For example, a 2005 study found that providing nutrition information at the point of sale in campus dining facilities had a positive influence on the food purchase behavior of college students.[31] Similarly, another study found that signs indicating the calorie content of available foods in a cafeteria setting significantly decreased the number of calories that people purchase.[32]

In sum, extensive evidence demonstrates that calorie information positively influences consumer behavior. *See generally Keystone Report*, at Appendix I. While research in this area is not complete, both the FDA-commissioned Keystone Forum report and the Institute of

---

[29] *See* RJN, Exh. C at 5 (CAL. ASSEM. COMM. ON HEALTH, ANALYSIS OF CALIFORNIA UNIFORM RETAIL FOOD FACILITIES LAW, S.B. 120); RJN, Exh. E at § 1 (Haw. H.B. 54); Exh. F at § 5(g) (Ill. H.B. 389); Exh. H at § 2(h) (Mass. S.B. 1290); Exh. J at 3 (N.J. A.B. 1693).

[30] CDC, Nat'l Ctr. for Health Statistics, *Healthy People 2000 Final Review* (2001); *Keystone Report* at 72; Alan S. Levy & Brenda M. Derby, *The Impact of the NLEA on Consumers: Recent Findings from FDA's Food Label and Nutrition Tracking System*, FDA Office of the Commissioner (1996).

[31] Martha T. Conklin, et al., *College Students' Use of Point of Selection Nutrition Information*, 2 TOPICS IN CLINICAL NUTRITION 20, 97, 97-108 (2005).

[32] R. Milich, et al., *Effects of Visual Presentation of Caloric Values on Food Buying by Normal and Obese Persons*, 42 PERCEPTUAL AND MOTOR SKILLS 155, 155-162 (1976).

Medicine have concluded that the currently available evidence supports immediate action with regards to nutrition disclosure.

### E.     The Current Regime Of Voluntary Disclosure Is Ineffective

As past experience has demonstrated, the current system of voluntary nutrition disclosure is ineffective. During the 1980s and 1990s, New York State and other public entities negotiated voluntary agreements with fast food companies such as McDonald's and Burger King to disclose nutritional information through brochures and posters in their restaurants. *See* Michael M. McCann, *Economic Efficiency and Consumer Choice Theory in Nutritional Labeling*, 2004 WIS. L. REV. 1161, 1198 (2004). These agreements proved ineffective because the fast food outlets packaged nutritional brochures with distracting promotional information and, worse yet, many locations did not offer the brochures or posters as promised. *Id.* at 1199, 1200. Without any threat of enforcement, the agreements "were implemented on an ad hoc basis" and thereby "produce[d] inconsistent results." *Id.* at 1202.

Under today's voluntary disclosure regime, most chain restaurants do not provide nutrition information. A survey of the largest chain restaurants found that half do not provide customers with any nutrition information, whether through menus, brochures, or posters.[33] Even when information is provided, it is not provided in a manner that is easy for customers to find and use. As the FDA has recognized, nutrition "information is not always readily available or observable at the point-of-sale." *FDA Calories Count Report*, at Part V(B); *see also Keystone Report*, at 128. While a number of chain restaurants offer nutrition information on their websites,"[l]ooking up nutritional information on a restaurant's food offerings on line before visiting the restaurants requires, at the very least, Internet access and advance planning." Rebecca S. Fribush, *Putting Calorie and Fat Counts on the Table: Should Mandatory Nutritional*

---

[33] M. G. Wootan & M. Osborn, *Availability of Nutrition Information from Chain Restaurants in the U.S.* 30 AM. J. PREV. MED. 266, 266-68 (2006).

*Disclosure Laws Apply to Restaurant Foods?,* 73 GEO. WASH. L. REV. 377, 385 (2005).

Similarly, placing information on materials such as napkins or tray liners are "not likely to be

distributed to consumers until after they have already made their purchasing decisions." *Id.*

The California Legislature's proposed menu labeling legislation highlights the

shortcomings of the current voluntary labeling regime:

> ... currently, restaurants are not required to provide consumers with
> nutritional information at the point of sale. While some restaurants
> provide nutritional information on websites, and fewer provide nutritional
> information upon request, half of all restaurants provide no nutritional
> information at all. Consumers who want to eat healthier are not being
> provided with the nutritional information they need to make healthier
> choices. The current system of voluntary labeling at restaurants is
> inadequate given the large role that restaurant foods play in the diets of
> Californians, and at a time when California is experiencing one of the
> fastest rates of increase in adult obesity .....

RJN, Exh. C at 3-4 (CAL. ASSEMB. COMM. ON HEALTH, ANALYSIS OF CALIFORNIA

UNIFORM RETAIL FOOD FACILITIES LAW, S.B. 120) ; *see also* RJN, Exh. E at § 1 (Haw. H.B. 54)

("Given the lack of nutritional information for most restaurant foods, it is difficult for restaurant-

goers to make decisions that limit their calorie and sodium intake").

As the FDA-commissioned Keystone Report concluded, "information provided at the

consumer's point of decision, wherever that might be, is most likely to be used and useful to the

consumer." *Keystone Report*, at 81. The Report thus recommended that information be provided

so that consumers may view it "when standing at a counter, while reviewing a menu board, in a

car when reading a drive-through menu, or when sitting down at a table reviewing a menu ...."

*Id.* at 77. The FDA Obesity Working Group's 2004 report similarly recommended that

restaurants provide "readily available, nutrient content information *at the point-of-sale.*"[34]

---

[34] *FDA Calories Count Report* at Part V(B) (emphasis added).

Thus, Regulation 81.50's requirement that calorie information be disclosed on menus and/or menu boards is not only reasonable but also consistent with FDA recommendations.

### F.    There is a National Consensus That Providing Nutrition Information on Menus Is Likely to Provide Significant Public Health Benefits

For the reasons set forth above, federal agencies and prominent health experts agree that requiring restaurants to disclose nutrition information is likely to yield important health and economic benefits. The FDA's Working Group on Obesity has concluded that "the pervasiveness of the obesity epidemic means that more nutrition information *must* be presented to consumers in restaurant settings."[35] Similarly, the U.S. Surgeon General has called for "increasing availability of nutrition information for foods eaten and prepared away from home."[36] The National Academies' Institute of Medicine has urged restaurants to "provide general nutrition information that will help consumers make informed decisions about food and meal selections and portion sizes."[37] In May 2006, the FDA-commissioned Keystone Report recommended that "[a]way-from-home food establishments should provide consumers with calorie information in a standard format that is easily accessible and easy to use." *Keystone Report*, at 76. Most recently, the American Medical Association endorsed nutrition labeling at fast food and chain restaurants.[38]

In sum, the FDA, state and local legislatures, and prominent health experts all recognize that nutrition information disclosure is an important strategy for addressing the public health

---

[35] *Id.* at Section V(B)(2) (emphasis added).

[36] *See* U.S. Dep't of Health & Human Servs., *supra* note 4.

[37] *See* INSTITUTE OF MEDICINE, *supra* note 28.

[38] *See* Press Release, Am. Med. Ass'n, AMA Adopts Policies to Promote Healthier Food Options to Fight Obesity in America (June 27, 2007), *available at* http://www.ama-assn.org/ama/pub/category/17768.html.

crisis of obesity. Far from constituting an "irrational" "social science experiment," Pl. Br. at 3, 4, legislation like Regulation 81.50 is sensible public policy that is supported by sound science.

In light of the enormous human and financial costs of obesity, states, cities and counties have a compelling interest in combating the obesity epidemic. Federal law does not preempt the authority of states and local governments to regulate in this arena which has long been a quintessential police power and matter of state and local concern. Moreover, nutrition disclosure legislation like Regulation 81.50 is sensible public policy that experts agree is likely to reduce obesity rates. This Court should not invalidate legislation that is both firmly grounded in science and falls squarely within the broad police powers that state and local governments have historically exercised in the public health domain.

## CONCLUSION

For the reasons stated above and in the brief of defendants, this court should reject NYSRA's request to strike down New York City's rule.

DATED:        July 10, 2007                     Respectfully submitted,

                                                DENNIS J. HERRERA
                                                City Attorney
                                                DANNY CHOU
                                                Chief of Appellate Litigation
                                                RAFAL OFIERSKI
                                                FRANCESCA GESSNER
                                                Deputy City Attorneys

                                                By: _____
                                                    FRANCESCA GESSNER
                                                    Deputy City Attorney

                                                Attorneys for Amici Curiae
                                                CITY AND COUNTY OF SAN FRANCISCO

## PROOF OF SERVICE

I, HOLLY TAN, declare as follows:

I am a citizen of the United States, over the age of eighteen years and not a party to the above-entitled action.  I am employed at the City Attorney's Office of San Francisco, City Hall, 1 Dr. Carlton B. Goodlett Place, Room 234, San Francisco, CA 94102.

On July 10, 2007, I served the following document(s):

**BRIEF OF AMICI CURIAE CITY AND COUNTY OF SAN FRANCISCO, CITIES OF PHILADELPHIA, PENNSYLVANIA, BALDWIN PARK, CALIFORNIA, PALO ALTO, CALIFORNIA AND WEST HOLLYWOOD, CALIFORNIA; COUNTY OF LOS ANGELES, CALIFORNIA, KING COUNTY, WASHINGTON, AND MONTGOMERY COUNTY, MARYLAND; NATIONAL LEAGUE OF CITIES, NATIONAL ASSOCIATION OF COUNTY & CITY HEALTH OFFICIALS, INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, AND LEAGUE OF CALIFORNIA CITIES; CALIFORNIA STATE SENATORS ALEX PADILLA AND CAROLE MIGDEN, NEW YORK STATE ASSEMBLYMAN FELIX ORTIZ, CHICAGO ALDERMAN EDWARD M. BURKE, AND WASHINGTON D.C. COUNCILMEMBER PHIL MENDELSON,**

**IN SUPPORT OF DEFENDANTS**

on the following persons at the locations specified:

Nancy G. Milburn
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
Telephone:  212-715-1000
Facsimile:  212-715-1399
*Attorneys for Plaintiff*

Michael A. Cardozo
Mark W. Muschenheim
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
Telephone:  212-442-0573
*Attorneys for Defendants*

in the manner indicated below:

☒    **BY OVERNIGHT DELIVERY**:  I sealed true and correct copies of the above documents in addressed envelope(s) and placed them at my workplace for collection and delivery by overnight courier service.  I am readily familiar with the practices of the San Francisco City Attorney's Office for sending overnight deliveries.  In the ordinary course of business, the sealed envelope(s) that I placed for collection would be collected by a courier the same day.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Executed July 10, 2007, at San Francisco, California.

_____
HOLLY TAN

k:\fgessner\nycbrief.doc